Ray MARSHALL, Secretary of Labor, United States Department of Labor, Plaintiff,

v.

J. C. PENNEY COMPANY, INC., Defendant.

No. C73–530.

United States District Court, N. D. Ohio, E. D.

Jan. 18, 1979.

Ralph D. York, U. S. Dept. of Labor, Nashville, Tenn., Edith Barnett, U. S. Dept. of Labor, Washington, D. C., Linda L. Leasure, U. S. Dept. of Labor, Cleveland, Ohio, for plaintiff.

James C. Sennett, Jr., Thomas E. Fennell, Jones, Day, Reavis & Pogue, Cleveland, Ohio, John G. Mann, Jr., J. C. Penney Co., Inc., New York City, for defendant.

## MEMORANDUM OPINION AND ORDER

BATTISTI, Chief Judge.

The Secretary of Labor brought this action on May 24, 1973, pursuant to Section 17 of the Fair Labor Standards Act of 1938 (Act of June, 1938, c. 676, 52 Stat. 1060, as amended, 29 U.S.C. § 201 *et seq.*), alleging that the defendant J. C. Penney Company, Inc., violated the Act's equal pay provisions (29 U.S.C. § 206(d)) by maintaining an unlawful wage differential at its Great Lakes Mall, Mentor, Ohio store between certain of its men and women employees. The Secretary seeks back wages for female salespersons, department heads, and a seamstress at the Great Lakes Mall store for the period from May 24, 1970 to the present, and an injunction against the company enjoining future violations of the equal pay provisions of the Fair Labor Standards Act at all J. C. Penney stores nationwide. This Court has jurisdiction under 29 U.S.C. Sec. 217.

The case was tried to the Court sitting without a jury on various dates between March 29, 1977 and November 4, 1977. The Court, having considered the record in this case, including the pleadings, the out-of-court testimony, and oral testimony in court, the exhibits introduced by both parties, the statements of counsel, and all the files, records, and proceedings herein, does hereby make and enter its Findings of Fact and Conclusions of Law and Order for Judgment as follows, in accordance with Rule 52 of the Federal Rules of Civil Procedure.

### FINDINGS OF FACT

1. Defendant, J. C. Penney Co., Inc., is a Delaware corporation qualified to do busi-

ness in Ohio and is engaged in the operation of a nationwide chain of approximately 1700 stores, including the Mentor Store. The parties agree that the defendant is an enterprise engaged in commerce within the meaning of sections 3(r) and 3(s)(1) of the Act, and that it is an employer having employees subject to section 6 of the Act.

Penney's corporate executive offices and headquarters are located in New York, New York. The New York headquarters supervises the activities of the Penney Company's retail stores through five regional administrative subdivisions, with headquarters in Pittsburgh, Pennsylvania; Atlanta, Georgia; Dallas, Texas; Rolling Meadows, Illinois; and Buena Park, California. The Mentor store is located in the Eastern region, with headquarters in Pittsburgh, Pennsylvania.

2. There are six types of J. C. Penney Stores: (1) softline or M.A.P. (merchandise assistance planning); (2) soft line; (3) limited line (food); (4) limited line (checkout); (5) limited line; and (6) full line. The Penney store at Mentor is a full line store, which means that it carries a relatively complete assortment of merchandise sold by the company, specifically including deliverable lines such as home electronics, tires, batteries, and automotive equipment. The same job descriptions, prepared at national headquarters, are applicable to every store in the company. The particular jobs in existence in any one store will depend on several factors, including the store's volume of business.

3. For the purposes of this lawsuit, the Mentor Store is the "establishment" within which jobs and wages are being compared. 29 C.F.R. § 779.23. The Secretary did not submit or offer any evidence respecting any other single establishment in the Penney chain apart from certain "snap shot" statistics dealing collectively with all Penney stores nationwide regardless of the size or type of store and the positions used therein.

4. The J. C. Penney's New York headquarters closely regulates the operation of its 1700 odd stores by issuing policy and procedure manuals and bulletins. Little deviation is permitted without the prior approval of officials of the regional or national headquarters, and an audit of each of the stores, at least once a year, reviews every phase of store operations, including personnel matters.

5. The Penney Company has been aware of the applicability of the Fair Labor Standards Act and its equal pay provisions to its operations for the time period pertinent to this lawsuit. Local stores are instructed how to comply with the FLSA, including its equal pay provisions. Since 1961, local store managers have been forbidden to settle alleged FLSA violations independently; any such alleged violations must be negotiated through the New York headquarters which will direct store managers to raise wages which are in violation of the Act if necessary.

New York headquarters has also issued to the local stores through the Digest of Personnel laws its views of which jobs in the stores are equal within the meaning of the Equal Pay Act and has represented to the local stores that compliance with the pay scales and job classifications issued by New York headquarters will result in compliance with the Equal Pay Act. It appears that on the national level, Penney has made a good faith effort to comport with requirements of the Act.

The Associate Solicitor of Labor advised the Company in 1970 that as to the then current job classifications for salespersons, the Department did not feel they would be relied upon as evidence of compliance with the Equal Pay Act. *See*, however, Findings of Fact 40–43, *infra*.

6. Prior to 1971, the Mentor store classified all salespersons, both male and female, in three classifications, as either "salespersons" (since redesignated "customer assistants") position code 021; "head salespersons" (since redesignated "merchandising assistants") position code 242; or "Selling Specialist A" (position code 077). (The 077 position is not under comparison in this lawsuit.) In late 1971, the Mentor Store added a fourth classification of salesperson, the "Selling Specialist B" (position code

076). The 021, 242, and 076 salespersons are paid a flat hourly rate and no commissions, except for the salespersons in cosmetics who are classified as 021 or 242, and who receive a 5% commission on their sales in addition to their base hourly pay.

The range of hourly wages for these three classifications is set by "The Schedule of Hourly Rate Structures," (Plaintiff's Exhibit 8). This schedule divides the Penney hourly rated work force into 10 labor grades, called position levels, which provide for progressively higher over-lapping pay ranges. The 021 positions are in grade 1, which, as of August 1977, was assigned a rate range from $2.40 to $3.12 per hour; the 242 positions are in Labor Grade IV, which was assigned a range of from $2.91 to $3.99 per hour; and the 076 positions are in Labor Grade VI, which was assigned a range of from $3.39 to $4.71 per hour. The Penney company claims that the 076 positions require greater skill, effort, and re-sponsibility than the 021 and 242 positions, thus justifying their higher pay.

7. Certain selling areas[1] in the store, referred to herein as "021 areas," are authorized to use only the lower-paid 021 and 242 selling positions; other selling areas, referred to as "076 areas," are authorized to use the higher paid 076 position in addition to the 021 position. Some persons classified as 021 sell in the 076 areas. Defendant claims that these salespersons are "in training" for the 076 position.

The Secretary claims that the work required of persons in all these job classifications is substantially equal within the meaning of the Act because its performance requires substantially equal skill, effort, and responsibility and it is performed under similar working conditions in the following fourteen selling or merchandise areas at the store.[2]

| Merchandise Area | Position Authorized under the Penney System |
|---|---|
| 1. Paint & Hardware (merchandising departments 1081, 1083, 1084 & 1087) | 021 & 076 |
| 2. Shoes (merchandising department 001) | 021 & 076 |
| 3. Photograph (merchandising department 1062) | 021 & 076 |
| 4. Women's Dresses (merchandising department 1022) | 021 & 242 |
| Bridal (merchandising subdivision 226) | 021 & 076 |
| Women's Coats & Suits (merchandising department 1026) | 021 & 076 |
| 5. Sporting Goods (merchandising departments 1060 & 1061) | 021 & 076 |
| 6. Cosmetics (merchandising subdivision 108) | 021 & 242 |
| 7. Lingerie and Robes (merchandising departments 1011 & 1012) | 021 & 242 |
| 8. Women's Sportswear (merchandising department 1025) | 021 & 242 |
| 9. Infants & Toddlers (merchandising department 1034) | 021 & 242 |
| 10. Girls (merchandising department 1030) | 021 & 242 |

1. The Court refers to "selling" or "merchandise areas" instead of departments (or subdivisions) to avoid confusing the fact that several merchandising departments may be staffed as a unit or area. For example, at the Mentor Store, Girl's merchandising departments 1030 and 1034 through 1038, and Infants, merchandising department 1034, are combined in a single selling area and staffed with 021's. Combi-nations of departments will vary from store to store.

2. The Secretary does not claim that all selling jobs in the store are equal. Thus, for example, the job of salesperson in such self-service departments as Candy, also classified by Penney as an 021 area, is not under comparison in this lawsuit.

| 11. | Boys (merchandising department 1040) | 021 & 242 |
| 12. | Men's Accessories (merchandising department 1050) | 021 & 242 |
| 13. | Piece Goods (merchandising department 1070) | 021 & 242 |
| 14. | Curtains & Draperies (merchandising department 1073) | 021 & 242 |

8. Both males and females are hired into each of the job classifications. There is evident a greater representation of males in the higher paying 076 areas, though any inferences that that may raise are beyond the scope of the Equal Pay Act.

9. The primary responsibility of salespersons in all areas under comparison is to assist customers in selecting merchandise. Salespersons are expected to stop whatever else they are doing, whether stockwork or housekeeping, to help a customer requiring assistance.

All salespersons in the selling areas under comparison, regardless of their classification as 021's, or 076's, or 242's, are responsible for stockwork and bookwork, which includes filling in stock, moving stock, making price changes on stock, counting stock, changing displays in their selling areas, and keeping their assigned areas straightened and in order; housekeeping, which includes dusting, straightening, and cleaning glass counters and fixtures; training or acclimating salespersons new to the selling area, to its procedures and merchandise; and reporting customer reaction to the merchandise to the supervisors of their selling areas.

10. The defendant claims that the 021 selling areas have their displays and fixtures arranged to promote self-service, whereas the displays and fixtures of the 076 areas presuppose sales assistance. Due to this fixturing and to the nature of the merchandise, defendant claims the 021 selling areas do not require the same exercise of selling skill by the salesperson. The plaintiff argues that it is the customer, rather than the merchandise or the fixtures of the selling area, who determines whether a particular sale is self-service and whether or not the salesperson is called upon to render assistance.

The record shows that in no selling area under comparison at the Mentor Store is all merchandise available without exception to be selected by the customer and brought to the cash register for ringing and wrapping without some intervention by the salesperson; conversely, there is no area at issue where all merchandise must be secured for the customer by a salesperson. Customers may self-select expensive items such as lawnmowers in such 076 selling areas as Hardware, and they may require considerable assistance with inexpensive items such as bras or infants' pajamas in such 021 selling areas as Girls' and Infants'. Nevertheless, the Court finds that even where the amount of customer assistance is the same, the type of assistance may differ from one area to another, demanding varying selling skill and effort on the part of the salesperson.

11. The plaintiff argues that while the percentage of time each salesperson spends in customer assistance varies from selling area to selling area and salesperson to salesperson, salespersons in all the selling areas under comparison are required to possess selling skill—that is, to be able to sell the merchandise, maximize sales in the area, and assist customers so that they feel they have made a wise purchase. The defendant counters that it is more difficult or demanding—thus requiring greater skill, effort, and responsibility—to "sell the products in the 076 areas."

Representative of the evidence on this issue is the testimony of Suzanne Goertz, who compared her experience selling in Boys', an 021 area, and Cameras, an 076 area. It was apparent that Mrs. Goertz perceived a difference between the two

jobs. When asked by the plaintiff whether her "duties changed" when she transferred from one area to another, Mrs. Goertz responded: "No—well, yes, they did. The main duty still was the same. It was selling the products." Tr. 1820. On cross-examination, the defendant expanded on this answer.

Q. (Counsel for Penney)

Is the merchandise in the [076] camera department store more complex than [021] boys clothing?

A. Yes.

Q. And is there a need—is there a greater variety of features and models and manufacturers which must be described to a customer in the [076] camera department?

A. Yes.

Q. You do draw a sharp distinction between the [076] camera department and the [021] boys' department?

A. Definitely.

Q. So that even if you did provide assistance to both the customers in the [021] boys' department and the customers in the [076] camera department, it was a different kind of assistance, was it not, Mrs. Goertz?

A. Yes.

Q. And drawing more upon your knowledge of the merchandise in the [076] camera department, didn't it?

A. Yes.

Q. And would you in the boys' department wait on customers?

A. Yes.

Q. And give information as to merchandise?

A. Yes.

Q. And you would attempt to persuade the customer to buy additional and higher-priced merchandise?

A. Yes.

Q. And to perform cashier and wrapping duties?

A. Yes.

Q. And to perform stockkeeping and bookwork duties?

A. Yes.

Q. And straightening merchandise?

A. Yes.

Q. And assisting in stock counts?

A. Yes.

Q. And assuring that the work area is kept neat?

A. Yes.

Q. And solicit charge applications?

A. Yes.

Q. And assist in the training of associates?

A. Yes.

Q. And Mrs. Goertz, didn't you do those same things in the camera department?

A. Yes.

Q. But there was a difference?

A. Yes.

Q. And the difference was in the type of assistance that was offered to the customer?

A. Right.

Tr. at 1860–62 (emphasis added).

Q. (Counsel for Penney)

Mrs. Goertz, isn't the merchandise in the [076] camera department more complex than the merchandise in the [021] boys' department?

A. Yes, it is.

Q. And aren't the customers in the camera department more discerning than customers in the boys' department?

A. Yes.

Q. And are not associates required to be more knowledgeable and have more detailed knowledge and use salesmanship to persuade customers in the camera department as opposed to the boys' department?

A. Yes.

Q. And what was the principal function, your principal function?

A. Selling.

Q. And was that not the same in the broad sense in both the boys' and the camera departments?

A. Selling, yes.

Q. But there was a difference in kind?

A. Yes.

Tr. at 1868–69.

12. The proportion of the work week which salespersons spend in performing their primary duties of selling and their secondary duties of performing book and stockwork, housekeeping, training salespersons new to the selling area, and reporting customer reaction, vary from salesperson to salesperson and department to department. The variations in time spent are not determinative of the amount of skill, effort, and responsibility required to perform the sales jobs under comparison.

13. Similarly, the details of the sales effort vary from department to department, as a direct result of the differences in the merchandise sold. Thus, in Lingerie, Junior Sportswear, Women's Dresses and Bridal, Coats and Suits, Men's Furnishings and Accessories, Infants, Boys, and Girls, salespersons bring garments to the fitting rooms to assist the customer, measure customers to determine sizes, advise as to fabric care, and offer opinions as to the proper fit of the garment. They also recommend gift items and sizes. In Curtains and Drapes, salespersons advise customers as to fabric care, window measurement for drapes, figuring of drape size, coordination of colors and material with the customer's decor, what rods and hardware are suitable for particular curtains and drapes, how to hang drapes and how the drapes are constructed. In Patterns and Fabrics, salespersons cut materials, measure customers for pattern size, and advise customers as to fabric care, how much material is required for patterns, what types of fabrics are appropriate for particular uses, what size pattern should be purchased, how patterns should be altered, and what notions are necessary for particular patterns.

In Hardware and Paints, salespersons advise as to how particular tools and lawn equipment are operated, what electrical parts are suitable for particular customers needs, and mix paint. In Shoes, salespersons measure for size and advise on fit. In Sporting Goods, salespersons fill out government gun and ammunition forms and drill finger holes in bowling balls. In Cameras, salespersons demonstrate camera operation and make minor repairs to cameras. In Infants, salespersons compare the features of furniture in the department and such items as infant auto seats, arrange for delivery and help assemble layettes. In Cosmetics, salespersons coordinate different types of makeup for the customers and determine appropriate products for particular skin care problems.

14. The level of skill necessary to perform effectively varies considerably from one area to another. Virtually every witness who described the assistance required in an 021 or 076 merchandise area testified that:

(i) the customer assistance in the 021 areas is generally routine and repetitive primarily involving cashiering and wrapping, locating merchandise, color coordinating, and merchandise, tasks requiring little skill from the salesperson;

(ii) in contrast, the customer assistance in the 076 merchandise areas is personal and specialized, requiring training or experience, a thorough understanding of the merchandise, and the communication of that knowledge to the customer in an effort to persuade the customer to buy;

(iii) the products sold in the 076 areas are generally more complicated structurally and technically than those sold in the 021 areas, requiring the salesperson to possess and exercise a greater degree of skill to be able to answer routine questions about the products; and

(iv) the products sold in the 076 department, with certain exceptions noted *infra,* tend to be of a higher price and therefore to require the salesperson to exercise a greater degree of salesmanship, or selling skill, to convince the customer to buy.

Therefore, the Court finds that the plaintiff has not met its burden of proving that the 021 jobs and the 076 jobs under comparison are substantially equal in skill.

15. The effort required by all salespersons under comparison consists of the physical effort of standing, walking, and carrying and the mental effort of waiting on customers, cashiering, wrapping, and filling out forms. The plaintiff and defendant agree that there is no significant difference in the physical effort required of all salespersons at Penneys. Although the plaintiff's expert suggested that the mental effort of cashiering for many customers might be equal to the mental effort of providing a long and detailed technical explanation of a product, there is insufficient evidence on this point to enable the Court to find that all salespersons must exert the same degree of mental effort to perform their jobs in the various departments.

16. The responsibility of all the salespersons under comparison is to sell the product, make sure that the product is accurately represented to the customer, care for merchandise properly, keep records accurately and make change correctly. However, the evidence showed that the more complicated products sold in the 076 areas generally change more often and in more technical detail than the products sold in the 021 areas, requiring the salesperson to exert a greater effort to keep abreast of new developments so as to be able to communicate those changes to customers. In addition, the salespersons in the 076 areas are responsible for providing a substantially higher level of customer assistance than are salespersons in the 021 areas.

17. All of the salespersons as well as the department/head merchandisers and alterations persons under comparison work in a modern, air-conditioned, well-lighted department store. Both parties agree that all employees under comparison work under the same working conditions.

18. In the 076 selling areas, the Penney Co. hires some unskilled and untrained salespersons at the 021 salary level. Penney designates these salespersons as 021's "in training." It is immaterial that Penney has no job description which distinguishes these salespersons from others classified as 021's.

19. There is evidence that 076's exercised significantly different levels of skill and responsibility than 021's "in training" in the same departments. Although all salespersons "sold" the same merchandise and started selling it immediately upon assignment to an 076 area, regardless of whether they had prior experience in selling that merchandise or had seen the company training films on the merchandise in the selling area, and some 076's testified that their duties had not changed when they were promoted from the 021 position, the record shows that the 021's "in training" were usually not left alone on the selling floor. Management tried to schedule a more experienced or more highly trained 076 to work with an 021, so the 076 could handle the more complicated questions or more difficult selling jobs.

When there was no experienced salesperson available, the record shows that 021's would "sell" the merchandise—that is, they would answer customer inquiries to the extent of their knowledge and would cashier and wrap packages. These are the same "selling" tasks performed by 021's in any selling area. They could not, however, exercise the same level of skill as an 076 because they generally did not have the same product knowledge or selling experience. Witnesses' estimates of the amount of time it would take the average person to acquire the skill to be "effective" in an 076 selling area varied from three months to two years. These estimates contrasted sharply with witnesses' estimates of the amount of time it would take the average person to feel "comfortable" or to "function effectively" in an 021 selling area—one week to one month.

Ron Pyles, a Penney Management Associate at the Mentor Store from 1966 through 1972, emphasized that although inexperienced salespersons are assigned to Photography (an 076 area) because of the unavailability of a sufficient number of associates

with practical experience with the equipment, these inexperienced salespersons cannot and do not effectively assist customers.

Q. (Counsel for the Secretary)

If selling in cameras required all this technical knowledge and skill, can you tell me why people were hired off the street into the camera department with no prior experience?

A. Mr. York, I have been asking that question for years. I have no idea why.

Q. But were those people able to function in the camera department?

A. No, sir, they were not.

Q. They were not?

A. No, sir, not if they came off the street with no prior skills like Belva [Cooper].

Q. Were they fired?

A. No. If I saw any hope for them, if they stood there and they looked like decent people who weren't stealing from us or something of that nature, we would get in and attempt to train them, because I knew if I got rid of them I would just get somebody else that didn't know anything, too.

Q. In other words, you would attempt to teach them the merchandise?

A. We would attempt, and if they were quick and they learned, we would leave them on.

Tr. 4079–80.

Q. (Counsel for Penney)

Does it take any time for an inexperienced person to acquire the needed knowledge in photography?

A. I would say an average person, if they walk in cold off the street, it would take about a year to become truly proficient.

An exceptional person, it could take six months to a year.

Q. And would an inexperienced person, when first assigned to the photography department, be performing the minimum job required in that department?

A. No.

Tr. 3993–94.

Witnesses testified repeatedly that in order to effectively assist customers, specialized training or experience is required in the 076 merchandise areas which is not required in the 021 areas.

Typical of such testimony is that of James Sciano, a management associate at the Mentor Store since 1973. When asked by the plaintiff to identify some of the factors which would determine the difficulty of "selling" or the level of customer assistance required in a given selling area, he identified the method fixturing displays, the required merchandise knowledge, and the price of the merchandise.

20. Salespersons classified as 242 head salespersons are required to, and do exercise significantly different levels of skill, effort, and responsibility than either the 076 selling specialists or the 021 salespersons.

Unlike the jobs of the 021 and the 076, the principal function of the 242 is to assist first-level supervisors and provide leadership to associates on the sales floor. The 242 "is not considered to be a direct customer assistance position in the same sense as [an] 021, 076 and 077 . . . ." [4]

[T]he function of (the 242) was to serve in a leadership position, in training other associates in the department and providing certain non-management support services to the Department Head or Department Manager responsible for that department rather than be scheduled on the floor for the purpose of providing direct service to customers.

Baumann Dep., Ex. 13, at p. 86.

The testimony of first-level supervisors confirms that the principal job duties and job functions of the 242 are unique. For example, Mara Walker, a female management associate hired in 1969, testified that 242's, unlike other associates, are "go-betweens," communicating her instructions to the associates, reviewing merchandise control books and being aware of new mer-

4. Baumann Dep., Pltf's. Ex. 9, at p. 82.

chandise and merchandise rates of sale. Onalee Reiss, hired in 1969, testified that the 242 in Draperies during the time she managed the department functioned as her "liaison" with associates on the sales floor. The 242 conveyed her instructions to the associates, reported on the state of the department and was given responsibility for mark-ups and mark-downs and the training of new associates.

In addition, associates working with 242's readily perceived the leadership role and different duties and functions of the 242. For example, Gertrude Anderson, an 021 associate in Lingerie from 1969 through 1976, testified that the 242 in Lingerie had job duties "over and above" those of other associates, including taking responsibility to see that counts were completed and conveying the supervisors' instructions to the associates on the sales floor. Moreover, every 242 who testified on the subject readily recognized that their jobs involved different and additional duties and functions in comparison to the jobs of the 021 and 076, duties and functions which were performed continuously and required a significant portion of their workday. For example, plaintiff's witness, Pat Spong, a 242 associate in Piece Goods from 1966 to 1976, drew a sharp distinction between her job as a 242 and her previous job as an 021.

Q. (Counsel for Penney)

[T]he duties that you have testified to, including the ordering and advising on fast selling items and working with the department manager and coordinating efforts such as arranging for model garments, these were functions you performed as the head sales person in that department?

A. Yes.

Q. And these were duties that other associates did not have, is that correct?

A. Right.

Q. And you had additional responsibilities and these being some of those additional responsibilities?

A. Yes.

Q. Did you also have the responsibility of coordinating the activities of all of the other associates in the Piece Goods Department in making sure that all of the areas were properly maintained and—

A. Yes.

Q. —properly stocked?

A. Right.

Q. And counts were taken when necessary?

A. Yes.

Q. In fact, when you were made aware of upcoming price breaks you pretty much took it upon yourself to coordinate activities and you, yourself, prepare for these price breaks?

A. Yes. I had to see that we were all ready for them. That fabric was on the floor and on the racks. Signs were in the sign holders. It was my responsibility to write the signs and see that they were ready when the sale was ready.

Q. And this would include the counts and making sure the merchandise is out.

A. Yes.

Q. And you also, I believe, testified that you would have the responsibility, additional responsibility, as the head salesperson, to make sure that new associates would become acclimated to the Piece Goods Department?

A. Yes.

Q. And would you also, in performing duties as the head salesperson, 242, recommend the items for markdowns?

A. Yes.

Q. To the department manager?

A. Yes.

Q. And work with them on what items those should be and the amount of the markdown?

A. Yes, right.

Q. So, in short, Mrs. Spong, is it fair to say that you had significant additional responsibilities and, frankly, a different job from the other associates in the Piece Goods Department?

A. I would say so, yes.

Q. And what percent of your time, if you can give an estimate to the Court, did you spend performing these duties and undertaking these responsibilities as head salesperson; can you give me a rough approximation?

Is it fair to say a significant amount of your time?

A. Well, yes, a significant amount of my time. I don't know what percentage, actually, because those duties were something that were carried on continuously.

Q. And a significant part of your job in that department?

A. Yes.

Tr. 3695–98.[5]

Finally, the defendant's expert, Jon Laking, following what was clearly an intensive and exhaustive study and evaluation of the sales floor jobs testified that the job of the 242 was substantially different with different functions and job duties than the other sales floor jobs.[6]

Despite this overwhelming and uncontradicted evidence, the plaintiff claims that the "primary responsibility" of the 021, 242, and 076 is the same, i. e., to "interface" with customers.[7] The Secretary's assertions that "an 021 who becomes a 242 in an 021 area . . . does not move into a different job

with a different basic function," and that "[t]he testimony of plaintiff's employee witnesses and of its expert witness to the effect that the job content of the 021, 076 and 242 jobs is substantially equal thus stands uncontradicted by credible relevant evidence" are clearly without evidentiary support and, indeed, are contradicted by virtually all of the evidence.[8]

21. It is also clear from the evidence concerning the different levels of customer assistance in the 021 and 242 merchandise areas, as compared to the 076 merchandise areas, that the job of the 242 requires substantially less skill, effort and responsibility to assist customers than is required of the 076.

The evidence shows that, although a 242 head salesperson may develop a considerable depth of merchandise knowledge, that knowledge covers a much narrower breadth of products than does the knowledge required of an 076 selling specialist, resulting in their exercising less skill overall. For instance, 242's in the Curtain and Drapery area have specialized knowledge of the method of ordering fabric for custom made draperies, including measuring, fabric content and care, types of rods, styles of draperies, *etc.* An 076 in the Paint and Hardware, Lawn and Garden area would be required to have similar type and degree of knowledge about lawn mowers, but he or

---

5. *See* also the testimony of Mildred Basiger, another witness called by the Secretary and an 021 promoted to the 242 position (Tr. 0740–41).

6. Tr. 5511.

7. *See* Pltf's. Br. at p. 33. The Secretary, relying on his expert's interpretation of Penney's position descriptions, argues that the position description of the 242 establishes that the "primary responsibility" of the 242 is to assist customers. Pltf's. Br. at p. 33. Mr. Robert Baumann, the Penney official responsible for the development of the 242 position description, clearly stated that the principal function of the 242 is to provide "leadership" and "non-management support services" to the department supervisor. *See* Baumann Dept., Ex. 9, at pp. 82, 86. Moreover, the Secretary ignores actual job performance, the Secretary's own standard for evaluating jobs. *See,* I.B. 29 C.F.R. § 800.121.

8. Pltf's. Br. at pp. 35, 46. The Secretary claims that the 242 was appraised using appraisal forms *identical to* those used for 021's and 076's. This ignores the evidence that appraisal forms were general and acquired specific meaning only in the context of the job being appraised. Tr. 5405–06. Furthermore, the Secretary's attempt to compare the occasional and sporadic performance of job duties by the 021 similar to those of *some* of the job duties of the 242 ignores the overwhelming evidence that *such job duties were performed regularly by* the 242. Moreover there is no evidence that 021's performed many of the most important job duties performed by the 242, *e. g.,* acting as intermediaries between the department supervisor and the associates on the sales floor. *E. g.,* Tr. 227–28, 434–35(a), 769–70, 2320–21, 2350–51, 3695–98.

she would also be required to have a like amount of knowledge about wallpaper, paints, lawn care products, and so forth. Thus the 076 is required to have and exercise greater skill than the 242.

In addition, the products in the 076 areas generally change more often than those in the 021–242 areas, placing a responsibility on the salesperson to keep his or her merchandise knowledge current. This is a different and significantly greater responsibility growing out of the nature of the merchandise, which the 242 salesperson generally does not have, or has to a significantly lesser degree.

22. The plaintiff alleges that 021 salespersons in Cosmetics perform jobs substantially similar in skill, effort, and responsibility to those of 021 salespersons and 076 selling specialists in the other departments under comparison. The evidence shows, however, that the 021 in Cosmetics has important duties and functions unlike the duties and functions of 021's in other merchandise areas. These job duties and functions, referred to collectively as the "line assignment," result from the assignment to each associate of certain merchandise management responsibilities for a number of cosmetic lines. They are responsible for fixing displays, determining initial orders, counting books, preparing sales reports, and keeping abreast of sales trends and new products. In determining orders, these salespersons work with vendor representatives, discuss and recommend orders to the department manager, and prepare sales reports for their particular lines. The evidence establishes that Cosmetic salespersons spend from 40% to 60% of their workday performing these tasks.

The plaintiff has offered no evidence that any 021 salesperson in any other selling area has merchandising duties and responsibilities similar to those of the Cosmetic salesperson. Such duties are unique.[9] The Court, therefore, finds that the job content of the 021 in Cosmetics is not substantially equal to that of the other 021 sales jobs at issue.

23. The Court now considers the 076 position. 021s in Cosmetics must have and exercise selling skill and product knowledge substantially similar to that required of 076 selling specialists in other merchandise areas compared in this lawsuit. Cosmetics salespersons are expected to and do discover the customers' needs, advise customers of the correct product for their particular skin problem or need, discuss the relative value of products for a particular customer, advise as to proper combination of products based on skin type, coloring, and so forth. This type of selling requires the same in-depth knowledge of a broad range of products as is required by an 076 selling specialist in, for instance, Sporting Goods or Bridal.[10] Also, cosmetics salespersons attend manufacturers' training courses, in most cases receiving more formal and concentrated training than that given to 076s by Penney. Similarly, 021s in Cosmetics, like 076s, are involved in a field where frequent product changes require them to be responsible for constant learning.

The defendant argues that because salespersons in Cosmetics spend a smaller percentage of their time in personalized selling (10–15%) than do 076 selling specialists (40–50%), they do not exert similar effort. The Court finds, however, that any disparity in

---

**9.** The plaintiff contends that since the Cosmetic salesperson and the 021 both perform many similar duties, *e. g.*, counting and stocking, therefore, the jobs are similar in content. However, Cosmetic salespersons perform counts as part of their responsibility to estimate future sales and recommend orders, responsibilities which the 021 and 076 do not have. Moreover, the important ordering responsibilities of the Cosmetic salespersons, including working with vendors, are not duplicated by 021's and 076's.

**10.** Plaintiff does not argue, and the Court is not required to decide whether all of the 076 selling jobs require equal skill, effort, and responsibility *to each other,* but only whether these jobs are equal to the 021 and 242 jobs under comparison here. Without so concluding, it would appear that the skill reflected by merchandise knowledge required of a salesperson in Cameras, for instance, is far different from that of a salesperson in Women's Coats because of the relative complexity of the merchandise and frequency of technical changes in the field.

selling effort is compensated by the extra effort required by the unique "line assignment" duties of the 021's in Cosmetics.

Although the Secretary has carried his burden with respect to the requirement that the two positions be substantially equal in skill and effort, the Court finds that the two positions are not substantially equal in responsibility. There are two notable differences in the levels of responsibility for the 021 in Cosmetics and the 076 selling specialist positions.

First, the 076 position includes a supervisory responsibility for the 021 salespersons in that 076 area. The work schedules are arranged so that an 076 will be on the floor with 021 salespersons to handle the more complicated questions on harder selling jobs (See Finding of Fact No. 19). The 076 also is involved in the training of 021 salespersons working in the 076 areas (Tr. 4079–80).

Second, there is varying responsibility for the products sold in Cosmetics and the 076 areas. The 021 in Cosmetics has responsibility for indepth knowledge limited to the line or lines assigned. This is significantly more narrow than the 076 selling specialists' responsibility for product knowledge of all items sold in the more diverse 076 selling area.

Therefore, the Court finds that the Secretary has not met his burden of proof to show that the positions of 021 salesperson in Cosmetics and the 076 selling specialists are substantially equal for the purposes of the Act.

24. The Secretary alleges that the J. C. Penney Company has maintained and continues to maintain unlawful wage differentials between six females and twelve males who, between May, 1970 and the present, have been first-line supervisors of merchandise departments, initially classified as department heads and later as merchandisers (position code 432) or merchandising mana-

gers (431). They were employed in the following merchandise departments or clusters of departments: [11]

(1) Lawn and Garden; Paint and Wallpaper; Lighting and Hardware;

(2) Women's Dresses & Bridal; Coats and Suits (Fashions);

(3) Women's Sportswear;

(4) Women's Sportswear; Lingerie and Robes;

(5) Cameras (Photograph Shop);

(6) Men's Clothing;

(7) Curtain and Drapery Shop;

(8) Curtain and Drapery Shop; Bedding Shop; Closet and Bath Shop;

(9) Men's Accessories, Sportswear and Furnishings (Men's Accessories);

(10) Family Shoes;

(11) Candy, Foods, Smokeshop; Stationery, Records; Luggage, Health and Beauty, Personal Care Appliances;

(12) Candy, Foods, Smokeshop; Stationery, Records; Luggage; Health and Beauty, Personal Care Appliances; Women's Accessories;

(13) Recreational Equipment and Apparel;

(14) Recreational Equipment and Apparel; Work Clothing; Toys and Wheel Goods; Adult Games and Hobbies;

(15) Recreational Equipment and Apparel; Work Clothing.

25. Throughout the J. C. Penney Company and at the Mentor store, first line supervisors of merchandise departments were classified as department heads until approximately September, 1974 when, as the result of a company-wide position reclassification, the positions of first-line supervisors were changed to merchandisers (Code 432). At the same time, department managers were reclassified as merchandising managers (Code 431), and senior merchandising managers, (Code 430).[12] Depart-

---

11. The component departments making up the various clusters changed from time to time, so that at one time Curtain and Drapery, for instance, was a single merchandise department, while at another time it was a part of the cluster including Bedding and Closet and Bath.

12. The major differences between department heads (subsequently merchandisers) and department managers (subsequently merchandise managers) were the number of departments for which each was responsible and the amount of time spent in selling on the floor in addition to

ment heads were paid an hourly rate plus a percentage of the department's sales, called an override; department managers were paid on a salary basis. All three categories of merchandiser, the 432, 431 and 430, are paid on a salary basis. Senior merchandising managers are paid more and have a more responsible position than merchandising managers; the merchandiser position is the lowest paid and least responsible of the three. The 430 senior merchandising manager position is not involved in this litigation.

The company-wide reclassification made little difference in the duties of the first-line supervisors; most department heads became merchandisers with no change in the department or cluster of departments which they managed. However, they all assumed certain general management responsibilities which they had not previously had, such as locking the store at night and supervising salespersons throughout the store.

26. There is no dispute that the work of the male and female department heads is equal and that the work of the male and female merchandisers (position Code 432) is also equal. Rather, the defendant claims that the male-female wage differentials in these categories are attributable to "factors other than sex." The defendant has admitted that the company considers all the jobs of department heads to be "substantially equatable" under the Act, and likewise that "the jobs of a merchandiser position 432 are substantially equatable under the Act" (Tr. 397a, 398a). Although there were separate position descriptions for each of the department heads depending on the departments supervised, they were virtually identical; the merchandiser positions, on the other hand, had only one position description regardless of the departments supervised. In addition, the company's own position descriptions and store organization manual set forth virtually identical job descriptions for the 432 merchandiser position and the 431

merchandising manager position. The 432 position is considered a "small" assignment, while the 431 position is considered a "medium" assignment. The only other difference between the two positions is that the 431 position is designated FLSA exempt, because the 431 is expected to perform "the basic responsibilities of a (J. C. Penney) executive" while the 432 is a non-FLSA exempt position expected to "sell merchandise and provide selling leadership," and has no executive responsibilities.

27. The supervisors under comparison were generally responsible for planning and building annual or semi-annual assortment plans and for periodically reordering stock from the assortment plans based on a count of stock on hand and estimates as to how many items they could sell; for selling merchandise on the floor which might consume as much as ¾ of their time; for supervising salespersons, which included interviewing applicants (although they were not responsible for hiring), scheduling the salespersons' hours, completing their yearly merit appraisals, and training them on the sales floor; for planning promotional sales; for maintaining departmental presentation, including displays, stockkeeping and housekeeping; for attending weekly store sales meetings; for shopping the competition; and for approving customer adjustments and exchanges and handling complaints.

Some supervisors had duties which others did not, but these duties were incidental to their basic functions and were not performed by all members of the same sex. For example, some of the males then classified as department heads (William Hammack and Charles Finley) locked up the store at night, while none of the females had such responsibilities until after their job classification was changed from department head to merchandiser. Male department heads Robert Burke and Walter Gosky never had the responsibility for locking

"bookkeeping" duties. The department heads spent a greater percentage of their time selling but were generally responsible for only a single department or a small group of departments. As a manager took on more departments, he or

she spent correspondingly less time selling and was then reclassified as a department manager of merchandising manager. The actual content of the jobs did not change, but the amount of responsibility did.

up the store. The department heads of Women's Fashions, Junior Sportswear, Men's Clothing, and Shoes had differing degrees of participation in fashion shows. Both Mr. Finley of Recreational Equipment and Apparel and Mr. Gosky of Shoes participated in sidewalk promotional sales, and Mr. Finley also conducted tent sales. Mrs. Cooper, the department head in Cameras, routinely took pictures of problem areas and other matters of interest around the store, and handled minor camera repairs.

28. Despite the admitted equality of the work of the male and female department heads, the males were paid more than the females almost without exception, whether comparing hiring rates or salaries at certain snapshot dates. Thus, no female under comparison became department head at more than the minimum base rate authorized by the J. C. Penney pay plan, while, with the sole exception of Otis Barnes, no male ever began as a department head at less than $.30 per hour above the minimum. When the department head classification was changed to the merchandiser classification in 1970, the company continued to pay experienced female merchandisers who had made the transition from department heads

less than similarly situated males and to start female merchandisers at lower rates than male merchandisers. One female, Mara Walker, while classified as a 431 merchandising manager, was paid less than 432 merchandisers William Hammack and James McLaughlin for the performance of an allegedly more responsible first-line supervisory position. (Plaintiff's Exhibit 6–1, 6–19, 6–20a)

Penney argues that wage differences between males and females are proper under the Act because they are attributable to objective, consistently applied factors other than sex, namely: (1) sales and management experience directly related to the assigned line, (2) general management training, and (3) the volume of the assigned merchandise line. The Court is thus confronted with the limited issue whether the differences in pay among department heads and the differences in pay among merchandisers are based on legitimate factors other than sex. The Court will examine the validity of each of these factors separately.

Penney groups department heads into the following categories:

| | Date to Position | Dept. Volume | Actual Annual [13] Earnings |
|---|---|---|---|
| **Directly Related Sales and Management Experience** | | | |
| Mauk, Jack | 02/01/66 | $350,000 (1966) | $ 8,780 |
| Roessler, James | 07/12/67 | $190,000 (1967) | $ 7,520 |
| Gosky, Walter | 08/03/70 | $430,812 (1971) | $ 9,447 |
| **Penney General Management Training & Experience** | | | |
| Finley, Charles | 09/06/71 | $243,841 (1972) | $ 8,473 |
| McLaughlin, James | 10/16/72 | $424,700 (1973) | $10,246 |
| Edmonds, James | 01/29/73 | $273,500 (1973) | $ 8,841 |
| **No Directly Related Experience or General Management Training** | | | |
| Cooper, Belva | 03/04/68 | $176,803 (1968) | $ 5,564 |
| Hammack, William | 03/03/69 | $386,103 (1969) | $ 8,691 |

13. Department heads are paid a salary and an override based on sales volume for the fiscal year in the assigned area. Penney's fiscal year commences on February 1 of each year. Computations of earnings represent actual earnings for roughly the first full fiscal year in position, e. g., if assigned in August or later, sales for the following fiscal year were used to compute earnings. These figures may differ from the expected earnings at the date of hire or assignment by reason of fluctuations in the volume of the assigned lines. Department volumes, salaries and overrides were obtained from the personnel files of the above associates contained in Pltf's Ex. 1 and from Plft's Ex. 6–21.

| No Directly Related Experience or General Management Training | | | |
|---|---|---|---|
| Teitelbaum, Betty | 03/31/69 | $497,475 (1969) | $ 6,647 |
| Walker, Mara | 04/30/72 | $647,265 (1972) | $ 8,177 |
| Burke, Robert | 10/10/72 | $260,000 (1973) | $ 7,384 |
| Reiss, Onalee | 12/30/72 | $292,743 (1973) | $ 6,956 |
| Barnes, Otis | 10/28/73 | $424,300 (1974) | $ 7,284 |

### 29. Directly Related Sales and Management Experience

Penney claims that the department heads listed under the category "Directly Related Sales and Management Experience" were hired directly into or for immediate promotion to the department head position because of their sales and management experience directly related to their assigned line. Upon examination, this criteria explains some wage rates, but not all.

Jack Mauk and Walter Gosky came to Penney with many years of shoe sales experience. Mauk had approximately 9 years of experience managing shoe stores. He was the assistant manager of a Baker's Shoe Store from approximately 1954 through 1958, sold shoes for Winkelman's Shoes from approximately 1959 through 1960, sold shoes for Carlisle Allen for approximately 4 months in 1961 and managed a Nobil Shoe store from approximately 1961 through 1966. Gosky managed a Nobil Shoe store from approximately 1969 through 1970, and had also completed three years of college including 1 year of business management when he was hired as the department head of shoes.

Although James Roessler had extensive retail management experience prior to coming to Penney, the evidence does not show that he had any prior experience "directly related" to the specific products he sold at Penney. In the 15 years prior to coming to Penney, he was the assistant manager and later manager of an F. W. Woolworth Co. store from approximately 1951 through 1962, the assistant manager and later manager of a Giant Tiger store from approximately 1962 through 1964, and the manager of Uncle Joe's Value Center from approximately 1964 through 1966. He was hired and subsequently promoted to the position of department head of Paint and Hardware. There is no evidence that he had any prior experience in selling, a job which the parties agree takes up ¾ of a department head's time at Penney.

Betty Teitelbaum, who became the department head of Women's Fashions in 1967, two years after Roessler became department head of Paint and Hardware, was hired at nearly $1000 less per year than he into a department with 2½ times the dollar volume.[14] She had 11 years experience in direct sales and sales management in the jewelry field, where she had supervised, recruited, and trained large numbers of salespeople, planned long-term sales objectives, ordered merchandise and controlled inventory, and planned, organized and directed large fashion shows.

It appears to the Court that Teitelbaum's experience in the jewelry field was as "directly related" to her work in Women's Fashions, as Roessler's experience was "directly related" to Paint and Hardware. Instead of neutrally applying this factor of experience, at the Mentor Store, Penney used it differently for males and for females, resulting in lower wages being paid to a female department head, Teitelbaum, than to a male department head, Roessler, for the same job. Thus the Court must conclude that it cannot qualify as a defense to an Equal Pay Act violation.

14. Dollar volume of merchandise in an assigned line was cited by Penney as a "factor other than sex" influencing salary level.

30. *Penney General Management Training & Experience*

The second group of department heads listed under the heading "Penney General Management Training and Experience" represent those department heads who had prior Penney general management experience or extensive and advanced management training.

Prior to 1974, Penney had two different management training programs. The "Merchandise Management Trainee B" program, position code 026, was designed to train associates for the position of department head, a career position requiring specialized management generally of a single merchandise area and which involved extensive selling responsibilities. The "Merchandise Management Trainee A" program, position code 025, and the "Management Trainee" program, position code 024, were programs designed to train associates for general store management positions including the department manager position. Participation in the 025 program was limited generally to individuals with two or more years of college and a strong interest in retail management. The 025 trainee position was more highly paid than the 026 position, although the testimony and their respective position descriptions show little difference in the program actually followed (Plaintiff's Exhibits 60 and 80 to Plaintiff's Exhibit 9). There was testimony than an 026 trainee was being trained solely to become a department head whereas an 025 trainee was supposedly training for general management positions at higher executive levels in the company, but 025 management trainees did in fact become department heads, as in the case of James Edmond, Charles Finley and James McLaughlin, while 026's in fact become department managers as in the case of Mara Walker.

Although the Compliance Officer found that both management trainee programs were "opened to male and female alike" (Narrative Report, Exhibit B–1), until 1974, when Marjorie Berg Gianelli, who is not under comparison in this lawsuit, became an 025, no female at the Mentor store was ever admitted to the 025 training program whereas seven males had been in the program (Charles Finley, James McLaughlin, James Edmond, James Sciano, Richard McAteer, Stanley Davisson, and Gary Glotzbecker). At the Mentor store, no males, but two females, Mara Walker and Onalee Reiss, had been in lower-paying 026 trainee programs. Despite their training, Mara Walker's and Onalee Reiss' beginning department head rates were less than that of Robert Burke who began his employment with defendant about the time of the females' promotion without any training at J. C. Penney or elsewhere in the procedures required of a Penney department head such as planning and controlling merchandise assortments and inventories.

The evidence also shows that females Betty Teitelbaum and Belva Cooper, hired directly as department heads, were not advised of the existence of either of these training programs, but were paid at a lower rate than other department heads as "on-the-job trainees" and, when the defendant agrees they were fully trained in their particular merchandise area, were still paid at lower rates than males who had been given the opportunity to enter and complete one of the formal company training programs.

For example, prior to becoming department head, Betty Teitelbaum had been "in training" for nine months at a rate of $2.00 per hour, while William Hammack had been "in training" for 14 months at a rate of $3.56. The defendant advanced no explanation for the disparity in their "training" rates. They became department heads at the same time, in March, 1969, she of Women's Fashions and he of Men's Clothing. Her starting salary as department head was $2.00 + .5% override; his was $3.25 + .5% override. This differential continued until she was transferred to another J. C. Penney establishment in October 1973; at that time she was earning $3.20 + .43% override to his $4.30 + .43%.

Mrs. Teitelbaum's beginning rate as a department head was also lower than the beginning rates paid to males who became department heads at a later date than she.

The evidence further shows that every person assigned to head a merchandise de-

partment in which he or she had no prior selling experience required some on-the-job training and assistance from supervisors and salespersons to effectively perform the job of department head. This occurred regardless of whether the person had completed a formal company training program. Testimony showed that the formal training program did not make a person more effective as a department head than did on-the-job training, and in fact the opposite seemed to be true.

Furthermore, completion of a Penney training program was not consistently applied to result in a higher starting wage for department heads. Comparing Mara (Thomas) Walker, a female graduate of the formal Penney training program, who became head of Women's Sportswear on April 30, 1972, with a similarly situated male employee who became a department head within several months of that date, Charles Finley, shows that she was made department head at $2.50 an hour + .46% override, while Finley started at $3.375 + .6%. This differential is not explained by prior experience and training. Walker had had some college when she was hired as a salesperson in May, 1969, and became an 026 department head trainee in November, 1970 prior to being given the department head position in 1972. Finley had had no prior sales experience but had just graduated from college with a degree in Business Administration prior to working for the store as an 025 management trainee for 2 years before becoming department head. Although Finley had more college courses in management, Walker had prior sales experience. In addition, Walker, was assigned to a department with 2½ to 3 times the dollar volume of Finley's department. (a factor Penney cited as contributing to salary determinations).

Walker was reclassified to 432 merchandiser in 1974 and was promoted to the next highest rank, 431 merchandising manager on March 30, 1975. After her promotion, she was paid at a lower rate than that being paid to William Hammack and James McLaughlin, who had not been promoted and remained in the lower 432 merchandiser position.

Since the factor of "Penney General Management Training and Experience" was not consistently applied to determine wage levels, the Court cannot consider it as a valid "factor other than sex" to excuse the payment of lower wages to female employees than to males for equal work.

Since it also appears that females were effectively excluded from the higher-paid 025 management trainee program, failure to complete this program cannot be used as a "factor other than sex" to explain the later wage differential of male and female department heads.

31. *No Directly Related Experience or General Management Training*

A third group of department heads are listed under the heading "No Directly Related Experience or General Management Training." Penney claims that these individuals, unlike Messrs. Mauk, Roessler, and Gosky, did not possess sales and management experience directly related to the specific merchandise line to be managed, and unlike Messrs. McLaughlin, Edmonds, and Finley, these individuals were not given general management training and did not possess prior Penney management experience. The Court finds, however, that these claims do not stand up to close examination. In addition, Penney fails to creditably account for the pay differentials within this third category.

Comparing the experience of Belva Cooper, department head of Cameras, and William Hammack, department head of Men's Clothing, she had had almost two years prior experience as a sales clerk and assistant manager at a Drug and Variety store, which was comparable to his food selling experience, and had sold cameras at Penneys and before, as he had sold men's clothing prior to becoming department head. Unlike Hammack, Cooper had basic knowledge in planning long-term merchandising sales objectives and had worked with and was familiar with control books and merchandising systems similar to those used at J. C. Penney. Despite their similarity of

experience, Hammack was paid $3.25 per hour + .5% when he became a department head in March, 1969; Cooper, who had already been department head of cameras for at least one year[15] was earning $2.40 + .5%. As of September 1974, just before they were both classified as 432 merchandisers, she was earning $3.40 + .73% override to his $4.03 + .43% override. Because of the smaller net sales of her department, her greater override did not eliminate the difference between their hourly base rates. The reclassification in September, 1974 continued the wage differential between Cooper and Hammack. Like Mrs. Teitelbaum, Mrs. Cooper continued to earn less than other male department heads hired at later dates than she.

Onalee Reiss and James Edmond became department heads one day apart in January, 1973 at rates of $2.50 per hour + .6% override and $3.4615 and .66% respectively, she of Curtain and Drapery Shop, he of Recreational Equipment and Apparel. These differentials are not explained by prior experience and training. Edmond, a college graduate with no prior sales experience, had been an 025 management trainee for 2½ years in another Penney's store prior to becoming a department head; Reiss had been a salesperson and assistant manager of a small food store for seven years prior to her employment by Penney's in November, 1968 as an 021 salesperson, had been promoted to 077 "Selling Specialist A" in March, 1971, and had then served as an 026 department head trainee from May, 1972 until she was made a department head.

Her prior experience in retail food sales also compares closely to William Hammack's as does her in-store sales experience. However, her beginning rate as department head of Women's fashions, a position she assumed in October, 1973, at the rate of $2.50 per hour + .43% override was less than William Hammack's beginning rate as department head of Men's Clothing four years earlier.

Penney argues that because Hammack's rate is considerably above both male and female department heads in the same category and is even higher than the rates of associates hired with extensive directly related management experience or assigned after graduation from a general management training program, it should be considered an "aberration," not attributable to sex. Hammack's high assignment rate was the product of his higher rate prior to assignment. He was hired and assigned as a part-time associate in Men's Suits, a commission sales area, and was later made a full-time associate in Men's Suits and promoted to the position of head salesperson. In this position, in addition to selling, he was expected to provide sales leadership, assist in the training of new associates and perform other tasks to assist the department manager in Men's Suits. Because Hammack could not devote full time to sales, he was paid an hourly rate roughly comparable to the earnings of commissioned salespersons. His hourly rate prior to his assignment as the department head in Men's Suits was therefore considerably above the pre-assignment rates of other department heads.

However, Penney does not explain why Reiss was not paid at the same high rate when her position was changed from 077 "Selling Specialist A," a commissioned selling position similar to Hammack's job as "head salesperson" in Men's Suits, to 026 department head trainee. It appears that male and female salespersons were not consistently paid at their prior rates. Therefore, the Court finds that in this case, the factor of prior rate does not satisfactorily explain the difference in pay between Hammack and the female department heads otherwise similarly situated.

32. The Court finds that males and females hired and promoted under the new management organization system, imple-

---

15. There was a considerable controversy at trial as to whether Mrs. Cooper became a department head in February, 1967 or March, 1968. It is undisputed that she officially became a department head no later than March, 1968 and that, prior to March, 1968, no female had ever been a department head at the Mentor store.

mented in the fall of 1974, were paid identical salaries, $9,800.00.[16]

The only exceptions were Arlene Topfer and Marie Iacobacci who were initially assigned as merchandisers at a salary of $8,900, the midpoint between the starting salary for trainees and the starting salary for merchandisers, because Penney felt they were not fully qualified without receiving additional training. However, Penney placed them on an accelerated training program requiring only six months instead of the customary one year, in recognition of their past sales experience at Penney. Approximately six months after their initial assignment they were promoted to full merchandiser status.

The Secretary's sole claim in respect to the new management organization structure is that the experience of Marie Iacobacci and Arlene Topfer at the time of their assignment to the positions of merchandiser entitled them to pay equal to individuals promoted from the merchandising management trainee position (433). The 433 training program replaced the 026 and 025 programs and was designed to prepare prospective management associates to undertake general store management responsibilities. Penney's position, which the Court finds credible, is that neither had experience equivalent to the training received by 433's sufficient to fully qualify them for the new position. Penney recognized, however, that both had sufficient experience to shorten the training period from one year to six months and pay them the same 433's rate midway in the training program.

Topfer and Iacobacci both testified that they were not qualified when first given the merchandiser title and required training to become fully qualified. Standing alone, this testimony would probably show only a recognition of these two women that they "became better merchandisers as they became more familiar with the job." (Plaintiff's Corrected Reply Brief at 5) Their testimony also shows, however, that even though these women had extensive retail experience, with Penney and before, neither had previous experience with controlling merchandise assortments in units and dollars or with the Penney stock control plans comparable to that given to Penney management trainees.

Additionally, the Court finds that in respect to this question, participation in the management training program was applied consistently and in a nondiscriminatory manner to determine initial salaries for 432 merchandisers. It is thus a "factor other than sex," constituting a valid defense to the plaintiff's charge of pay discrimination.

33. The Secretary alleges that the defendant has maintained an unlawful wage differential between seamstress Edith Henderson and tailor Tadeus Kacperski. From 1962–1966, Henderson was the only alterationist in the Mentor store and did all necessary fitting, marking, and alterations to men's, women's, and children's clothing and draperies. She had learned sewing and men's tailoring as a child from her mother, who had been a professional tailor in Europe and had a tailoring shop in her home in

16. This fact in itself makes the Court question the validity of the factors supposedly relied upon by Penney in prior years to excuse violations of the Act. Since in 1974, after this suit was filed, there ceased to be any disparity whatsoever in hiring or promotion rates, the Court is led to conclude that there were suddenly no differences among new hires in prior experience, training, dollar volume of department sales, etc. If these considerations were bona fide to begin with, it seems unlikely that such a shift would occur, or that it would occur so suddenly. Defendant's proposed findings of fact at 133; Plaintiff's Ex. 6–19.

A similar adjustment in comparative hourly rates of male and female 242, 076, and 021 "in training" salespersons occurred at about the same time. Defendant's Exs. C–21(A) and C–23(A); Plaintiff's Exs. 6–22 and 6–23.

Defendant's exhibit C–20 is a chart purporting to show that there was no difference in the hiring rates of male and female 021 salespersons during the period covered by this lawsuit. The chart does not, however, include the 021's "in training" who were hired into the 076 departments. The Secretary has shown that the 021 job was equal in terms of the Act throughout the Mentor Store. Therefore, a chart which singles out certain departments for analysis is not probative in determining whether female 021's were paid at the same rate as males throughout the store.

this country. Mrs. Henderson herself had had an alteration business in her own home for four years prior to her employment with Penneys. During her entire employment at the Penney Mentor Store, Mrs. Henderson was consistently awarded superior performance ratings.

In November, 1966, after the Mentor store was remodeled and enlarged, Peter Uhlir, an experienced tailor, was hired for the men's alteration work, while Mrs. Henderson was assigned to the women's alteration work. Although they were apparently equally experienced, Mr. Uhlir's hiring rate of $4.00 per hour was $2.15 per hour more than Mrs. Henderson's pay after 3½ years at the store. When Mr. Uhlir left the store in July, 1969, he was earning $1.40 per hour more than she. Tadeus Kacperski was hired in July, 1968 to replace Mr. Uhlir at $3.50 per hour, which was $.75 more per hour than Mrs. Henderson was earning after seven years at the store and consistently superior personnel evaluations. As of April, 1976, he was earning $1.21 more per hour. Since he is classified as an 056 alterations supervisor in position level VII on the store schedule of hourly rate structures, while Mrs. Henderson is classified as an 055 alterations assistant at position level VI, the inevitable result of these classifications is the continuance of the earnings gap.

34. Both Mr. Kacperski and Mrs. Henderson have their own alterations workroom adjacent to the men's and women's fashion selling areas respectively. Both have essentially the same equipment for use in their respective alterations workrooms: steam pressing irons, blind stitch machines, and straight stitch machines. She has a buttonhole machine in her workroom which he uses when necessary. Both perform essentially the same functions at the store; he fits, marks, and alters men's clothing while she fits, marks, and alters women's clothing. The amount of time each spends in these different functions will vary. She fits every bridal gown purchase, while he will fit and mark men's suits only when there is a fitting problem which cannot be handled by a salesperson in the men's department.

Both Mrs. Henderson and Mr. Kacperski make repairs to stock. Both are involved in the fashion shows which the store sponsors. Both receive assistance when necessary from Mary Carlucci or others in performing their alterations duties.

Mrs. Henderson herself has been called upon to complete some of Mr. Kacperski's alterations during peak periods, and when he has been on vacation. On occasion, some of Mr. Kacperski's extra work has been sent out to another tailor. Mr. Kacperski has never done any alterations on the women's side. On the other hand, Mrs. Henderson has been called upon to perform some men's alterations which Kacperski was unable to accomplish; she, unlike he, has demonstrated an ability to alter both men's and women's clothing, while he has only demonstrated an ability to alter men's clothing.

Fabrics and styles change more readily in women's garments so that each one needs a different kind of handling. Since women's clothing is frequently formfitting, the same care is not required in making alterations to men's suits as to women's clothing. Men's suits do not have the great number of seams or overlays of lace found on bridal gowns which must be taken off stitch by stitch before the alterationist can even begin to work on a seam. Most of the alterations work in the men's area involves the cuffing of pants, which is an extremely simple operation and takes five to eight minutes. The simplest alteration in women's *i. e.* hemming a street dress, is more complicated and requires ½ hour to 45 minutes. Mrs. Henderson has frequently been called upon to do extensive alterations to bridal gowns, which can require her to virtually remake a garment. Nothing this complex has been required in men's suits alterations.

35. Although Mr. Kacperski is classified as an 056 alterations supervisor, and Mrs. Henderson is classified as an 055 alterations assistant, the position descriptions for these classifications do not reflect the work actually done.

Mr. Kacperski has never supervised Mrs. Henderson, although his position description calls for the supervision of all store alterations activities. Although he has been classified as a supervisor since his hire in 1969, he was not even told that he was a supervisor until 1975 or 1976, well after the filing of this lawsuit. He was not listed as a supervisor on the store's organizational chart, which is conspicuously posted at the store, until after Mrs. Henderson testified in the trial of this lawsuit in March, 1977. Had he been a supervisor, he presumably would have been responsible for allocating his excess alterations work to other alterations personnel in the store during his absences for vacation or at peak periods; however, this function is actually performed by the store manager or operations manager.

Mr. Kacperski has never scheduled Mrs. Henderson's hours or undertaken her yearly appraisals, he has never ordered her supplies—she has done the ordering herself or through the operations manager. While his position description calls for him to approve the time sheets and expenditures for operating supplies, there is no evidence that he has ever performed this function.

Prior to 1974, Mrs. Henderson was classified as a head alteration person (formerly head seamstress) in a lower pay grade than that allowed for the alteration assistant position. Her duties in the head seamstress (later head alterations person) capacity also did not conform to her position description. As head seamstress, prior to the employment of tailor Peter Uhlir in March, 1969, she was responsible for supervising all alterations activities in the store as the position description requires, but she also performed extensive fitting services, a duty which does not appear in the position description. She was reclassified by store manager Harry Anderson to the position of alterations assistant, not because her duties changed, but because he wished to give her an opportunity for greater earnings. Anderson admitted that there was no change in her duties, that she did not assist anyone, and that he never reviewed the job classifications of either Kacperski or Henderson to see if they were properly classified or that the classifications properly reflected the actual job content of either classification.

36. The defendant presented charts purporting to summarize the alterations tickets with the intent of showing the number of garments altered and alterations performed in the Women's Fashions, Men's Work Clothes, and Boys' departments in the years 1975 and 1976. These charts showed far fewer garments being altered and far fewer alterations performed in the Women's than in the Men's Work Clothes and Boys' area. These charts do not prove what they purport to prove. The numbers in the charts are irrelevant for two reasons: (1) their accuracy is suspect; and (2) they are not a true reflection of the work actually performed by Mrs. Henderson and Mr. Kacperski, or the relative skill and effort required.

Mrs. Henderson testified that she was only recently instructed to retain her alterations tickets, has thrown away numerous tickets which were damaged by water leaking through the roof, has regularly disposed of accumulations of old tickets, and suspects that the salespersons on the floor have failed to return at least some of the 1975–1976 tickets to her. She testified that the alterations figures on the defendant's summary charts for Women's appeared too low. In addition, Mrs. Henderson and Mrs. Carlucci have actually performed some of the alterations for the Men's department, as has an outside tailor, although the charts ascribe all alterations in the Men's department to Mr. Kacperski.

The charts show only the raw numbers of alterations performed and make no allowance for varying degrees of difficulties of the alterations. The testimony clearly indicates that different types of alterations require varying amounts of time to perform, and varying skill. The testimony also shows that the individual alterations performed by Mrs. Henderson tend to be more time-consuming and require more skill than those performed by Mr. Kacperski. The charts also do not show the incidental duties performed by Mrs. Henderson and Mr. Kac-

perski in connection with fashion shows and repairs to stock. Consequently, the raw numbers of defendant's charts are not determinative of the relative skill, effort, and responsibility required by the tailor and seamstress in the performance of their jobs.

37. The Court therefore finds that the jobs of 056 alterations supervisor and 055 alterations assistant at the Mentor store are equal in skill, effort, and responsibility under the Act. Thus, Penney has violated the equal pay provisions by paying males and females in these jobs at unequal rates.

38. The record shows that before 1974, male salespersons were consistently hired at higher average hourly rates than female salespersons. Prior to late 1971, all new personnel were hired into the selling areas under comparison as 021s. During the time this practice was followed, the average hiring rates for males exceeded those of females by $.07 to $.37 per hour, even where the males and females compared were hired into the same selling area.[17] From late 1971 until 1975, male employees hired into the selling areas under comparison were hired at an average of $.08 to $.11 more per hour than female employees. The Mentor store added the 076 classification in late 1971. To the extent that the pay differentials can be attributed to the company's practice of hiring males but not females into the higher paid 076 position, there is no Equal Pay Act violation. Based upon the evidence presented, the Secretary has not met his burden to prove that the performance of the 021 and of the 076 positions are substantially equal in skill, effort and responsibility.[18] However, to the extent that wage differentials existed between female 021s and male 021s, the positions being substantially equal in skill, effort, and responsibility, the Secretary has met his burden to prove an Equal Pay Act violation.

In 1975 and 1976 the hiring rate disparity in the comparison areas ceased because the store hired all new salespersons in these areas as 021s at the 021 rate. Prior rate differentials between males hired as 076s and females hired as 021s, despite apparently equal qualifications, have not been brought into balance through pay increases. However, the evidence presented does not establish that the performance of the 076 and the 021 positions are equal in skill, effort and responsibility as required by the Act,[19] and are therefore not subject to an Equal Pay Act remedy.

39. In addition to being hired at lower rates than comparable males at the Mentor Store, females have been generally paid less than males with comparable lengths of service. This problem is inter-related with the problem of disparate hiring rates; if a male and female are hired in the same year at a differential in pay and received comparable annual pay increases, the female will never catch up to the male. This has occurred in the case of Michael Korenko and senior female salespersons hired at the same time. In a couple of instances where females have averaged more than males with apparently comparable seniority, the males had had lengthy absences, thus depressing their pay increases. This occurred in the case of Gregory Patt in Cameras. Also in Sporting Goods, Patrick Callegan was absent for a year while female Jeannine Heckman was reclassified to the higher-paid 076 position.

40. Penney argues that in respect to differences in pay as between job classifications, e. g., as between 021s, 242s and 076s, its job Organization and Compensation System constitutes a valid factor other than sex. Penney argues that even if its evaluation of differences in the skill, effort, and responsibility required of sales floor jobs is found to be faulty, it does not necessarily follow that sex was a consideration in the design of the System so as to invalidate it as a bona fide factor other than sex.

41. The Court finds that the System does not fully measure jobs according to the

---

17. For example, in 1970, five females were hired into the Shoe Department as 021s at $1.65 per hour; five males hired as 021s that same year received beginning rates ranging from $1.70 to $2.25 per hour.

18. See Finding of Fact No. 14.

19. *See* Finding of Fact No. 14.

statutory criteria. However, for the most part the System for the comparison does measure what it purports to measure, *i. e.*, the level of customer assistance required of the jobs in the different merchandise areas.[20]

The question, therefore, is whether Penney can rely and, in fact, has consistently relied on this measurement of differences in the level of customer assistance in setting wages, that is, is the System bona fide?

The Court's inquiry is therefore directed to the following questions: (1) did sex in any way influence the creation and development of the Penney job Organization and Compensation System; or (2) if sex did not influence its creation, did sex nevertheless influence the application of the otherwise neutral System at the Mentor Store. The Secretary made no distinction between these issues. His principal attack on the validity of the System was to offer statistics concerning job placement which he asserts show that the System has a "disproportionate impact" on females.

These statistics are of questionable relevance to this suit. First, the Title VII concept of "disproportionate impact" does not apply to this, an Equal Pay Act case.[21] Nevertheless, such statistics, if indeed showing a disparate impact on females, may permit the Court to draw the inference that Penney has pursued a general pattern or practice of discrimination which either influenced the creation or the application of the Penney System.

In regard to the creation of the System, Penney has introduced persuasive evidence establishing the objectivity and bona fides

of its job Organization and Compensation System. It is clear from the evidence, for example, that the Penney System (1) was created only after thorough and exhaustive studies, extending over three and one-half years, (2) was directed by Robert W. Baumann, an expert in job analysis hired from outside the company, (3) included the development and use of objective fact gathering tools, (4) involved the creation of separate teams to gather and analyze the facts, minimizing the potential for any preconceived bias, and (5) most importantly, in respect to the sales floor jobs with the principal function of assisting customers, involved the use of what is recognized as the most precise and objective method of job evaluation, the point factor analysis. Finally, position descriptions were carefully developed for all the sales floor positions and were used as the basis for fixing relative compensation.

The Court finds that the defendant's evidence concerning the design and development of its job evaluation System far outweighs any inference from statistics that sex played a part therein.[22]

42. Plaintiff's expert industrial engineer and labor arbitrator, Bert Gottlieb, testified that the Penney System is fundamentally defective because it rates jobs on the basis of merchandise characteristics rather than job duties. The Court finds, from its own study of the jobs in question based on the evidence in this lawsuit, that this analysis is faulty. If the System did measure jobs only on the basis of merchandise characteristics, the job in Shoes, for instance, would never have been assigned to the higher-paying 076 position. Defendant's explanation that the System measures the degree of

---

20. The Secretary argues that a job classification system to qualify as a "factor other than sex" must measure jobs in terms of skill, effort and responsibility. *See* Pltf's. Br. at pp. 82–83. This argument is erroneous. A "factor other than sex" can be *any* factor including experience, training, profitability or differences in the level of customer assistance as long as sex is not part of the factor. *See, e. g., Hodgson v. Robert Hall Clothes. Inc.*, 473 F.2d 589 (3d Cir. 1973), *Wirtz v. Citizens First National Bank*, 58 CCH Lab.Cas.Par. 32,050 (E.D.Tex.1969).

21. It is also clear that statistics as to placement are totally irrelevant to the issue of job comparability. The fact that all males hold a higher paying job than females is not probative of the skill, effort, and responsibility required of the respective jobs.

22. The statistical approach of the Secretary ignores the fact that any factor other than sex asserted as a defense in the context of Equal Pay Act litigation will necessarily have a disparate impact on the select group under comparison. *See, e. g., Hodgso. v. Robert Hall Clothes, Inc.*, 473 F.2d 589 (3d Cir. 1972).

customer assistance is wholly supported by the record.

Plaintiff's expert conducted only a cursory study of the jobs at the Mentor Store. He visited the Mentor Store for 5 days during the first week of February, 1977, shortly before the commencement of trial, interviewing 16 associates and making limited observations in only the merchandise areas at issue. Prior to testifying, he read the depositions of a number of witnesses.

Mr. Gottlieb acknowledged that the situation at the Mentor Store from January 31, to February 4, 1977 was "unusual" because of the extreme weather conditions, a natural gas shortage, and reduced store hours. Having no previous professional exposure to the retail industry as a job analyst or evaluator, he did not know that the first week in February is the slowest period in the retail year. He spent roughly one hour observing associates in each of the merchandise areas at issue and approximately one hour interviewing each of 16 associates. The observation in a given merchandise area was made generally without interruption and, therefore, did not permit an examination of the job at different times of the day or over the entire work cycle. In fact, it was in his judgment that "it was not important" to observe the job duties of an associate over the full work cycle.

Furthermore, Gottlieb did not use any one of the four generally recognized job evaluation systems, but rather used what he referred to as a "more informal type of job analysis". Mr. Gottlieb reached his conclusions although he did not observe the sale of a single item of merchandise in Women's Coats; he did not observe the sale of a camera or projector or similar equipment in Photography; he did not observe the sale of a rifle, shotgun, inflatable boat, motor or similar item in Sporting Goods; and he did not observe the sale of a power lawn mower, riding mower, item of farm equipment, power tool, or welding equipment in Paint & Hardware.

This method of analysis contrasts sharply with the thorough and comprehensive study made by the Penney Company, and leads the Court to believe that Mr. Gottlieb's conclusions about the various jobs are of little probative value in this lawsuit.

43. Defendant's expert witness, Jon Laking, of Hay Associates, testified that his evaluation, according to the Hay System, of the 021s and 076s employed at the Mentor store in the departments under comparison, agreed with the Penney Company evaluation of the 021 sales jobs as requiring less skill, effort and responsibility than the 076 sales jobs. He excluded the 242 jobs from his evaluation. Laking was retained by the Penney Company to evaluate the sales jobs at the Mentor store in accordance with the Hay System, and performed the evaluation shortly before the trial in this case commenced. He was assisted in his evaluation, which was based on interviews and observations at the Mentor store, by Mark Clifford, the current store personnel manager, and John Waltz, the current district personnel manager, neither of whom had any prior job evaluation experience. He was also assisted by Robert Baumann, the J. C. Penney corporate official responsibility for two job evaluation plans evolved by Penney which Penney claims show that sales jobs in dispute are unequal.

The Hay System does not measure jobs in terms of the statutory standards of skill, effort, responsibility, and working conditions. The Hay System admittedly had nothing to do with the past pay practices at issue in these proceedings and is not to be used as a basis for setting pay rates in the future, in the Mentor Store or anywhere else in the company. Thus, although Mr. Laking's conclusions appeared to be objective and reliable, and were considered by the Court in its own assessment of the jobs under comparison, they cannot be considered as determinative of the issues here, namely the equality of jobs in terms of the Act or the existence of affirmative defenses to violations of the Act.

44. Despite the finding that the Penney System is a bona fide method of measuring the one factor of required customer assistance which it purports to measure, the Court cannot consider it a complete defense

to the Equal Pay Act violations found herein. To begin with, the System does not even purport to measure one of the jobs at issue here, the 242 head sales-person position. More importantly, the record shows that the system was not consistently and objectively applied at the Mentor Store. The sexual bias of the individual administrator can and does enter into the hiring and promotion process, diluting or sometimes nullifying application of more objective criteria.

Previous findings have detailed the prior store history of hiring females and males into the same jobs at disparate rates. In addition, by classifying salespersons in the 076 position and paying them at the higher 076 rate, Penney has favored males and continues to pay them at a higher rate than females. Between August, 1971 and March, 1973, nine males, some of whom had no prior store service, were given 076 positions at starting rates ranging from $2.35 to $3.00, an average of $2.66, while eight females, some with six or more years prior store service in the same areas where they became "specialists," were given the 076 classification at rates ranging from $2.40 to $2.50 an average of $2.43 per hour. (Plaintiff's Exhibit 6–22a) Despite the fact that, between August, 1971 and September, 1976 only 29% of the 313 salespersons hired into the comparison areas were male, males constituted 100% of salespersons hired directly at 076s during this period. Nine salespersons came into the store directly as 076s, and they were all male. (Plaintiff's Exhibit 6–22a, 6–35a)

45. These disparities appear to be the result of the policies of individual store personnel and not of the Penney Company as a whole. The violations were most flagrant during the period when Mr. Fries was the Mentor Store Manager, and there was testimony indicating that these violations were a result of his personal biases. Evidently in an attempt to counteract the influence of Mr. Fries, the Company management installed Mrs. Somers as Personnel Manager at the Mentor Store in August of 1972.

Mrs. Somers testified that the reason certain merchandise areas are filled exclusively or predominanately by females is because she took into account in making assignments the potential for customer "embarrassment" and associate preference. Christine Darnell testified that Mrs. Somers urged her to transfer to the Cosmetic department from Paint and Hardware because Hardware was "no place for a woman." (Tr. 2630–32) Both of these witnesses were credible, but the Court does not cite them for the truth of their statements. The testimony shows, rather, that the System retains a potential for Equal Pay Act violations.

Moreover, there was testimony at trial indicating that the store may have resumed its former practice of hiring males as 076s and females as 021s, regardless of their qualifications. Recently a female, Judith Morton, with three years prior experience in selling shoes, was hired into the Shoe department as an 021 "in training" while James Bowser, a male with a camera hobby but no prior experience in selling cameras (he had sold sporting goods for a year) was hired into the Camera department as a higher-paid 076. Thus it is evident that there are no reliable checks built into the Penney System to ensure that even the factor it measures, level of customer assistance, will be consistently and objectively applied to determine level of compensation.

*Conclusions of Law*

1. This Court has jurisdiction in the instant cause of action pursuant to the equal pay provisions of the Fair Labor Standards Act of 1938 as amended, 29 U.S.C. § 201, *et seq.* ("Act").

2. Defendant J. C. Penney Company, Inc. is an enterprise engaged in commerce as defined in 29 U.S.C. § 203(r) and (s)(1). The defendant is also an employer subject to 29 U.S.C. § 206(d)(1) which provides:

No employer having employees subject to any provisions of this section shall discriminate, within any establishment in which such employees are employed, between employees on the basis of sex by

paying wages to employees in such establishment at a rate less than the rate at which he pays wages to employees of the opposite sex in such establishment for equal work on jobs the performance of which requires equal skill, effort and responsibility, and which are performed under similar working conditions, except where such payment is made pursuant to (i) a seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity or quality of production; or (iv) a differential based on any other factor other than sex: *Provided,* that an employer who is paying a wage rate differential in violation of this subsection shall not, in order to comply with the provisions of this subsection, reduce the wage rate of any employee.

The J. C. Penney Mentor, Ohio, store is one "establishment" for the comparison of jobs and wages in the cause of action. *Hodgson v. Robert Hall Clothes, Inc.,* 326 F.Supp. 1264 (D.Del.1971), *rev'd* on other grounds, 473 F.2d 589 (3rd Cir. 1973); *see also* 29 (FR § 779.304.) [23]

■ 4. In order to establish a prima facie case under the Equal Pay Act, the Secretary of Labor has the burden of proof to show that an employer pays different wages to employees of opposite sexes for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions. *Corning Glass Works v. Brennan,* 417 U.S. 188, 94 S.Ct. 2223, 41 L.Ed.2d 1 (1974). *See,* 109 Cong. Rec. 9196 (1963) (Rep. Frelinghuysen); 109 Cong.Rec. 9208 (1963) (Rep. Goodell).

■ The amount of wage differential for employees of opposite sexes is of no importance on the general issue of liability, *Brennan v. Victoria Bank and Trust Co.,* 493 F.2d 896 (5th Cir. 1974); *Hodgson v. American Bank of Commerce,* 447 F.2d 416 (5th Cir. 1971). It is also not significant that some women earn more than some men, *Hodgson v. American Bank of Commerce,* 447 F.2d 416, 421 (5th Cir. 1971); *Cf. Board of Regents v. Dawes,* 522 F.2d 380 (8th Cir. 1975).

■ 5. The standard under the Act that the jobs being compared require equal skill, effort, and responsibility in their performance, has been held not to require that they be identical in every respect. The restrictions of the Act were meant "to apply only to jobs that are substantially identical or equal." [24] Inconsequential differences in job content do not remove the positions from the purview of the Act's restrictions. *Brennan v. Owensboro-Daviess County Hospital,* 523 F.2d 1013 (6th Cir. 1975); *Brennan v. City Stores,* 479 F.2d 235 (5th Cir. 1973); *Hodgson v. Square D Company,* 459 F.2d 805 (6th Cir. 1972), affirming 19 W.H. Cas. 752 (E.D.Ky.1970).

■ 6. Actual job performance and requirements are the focus for application of the equal pay standard. The employer's job classifications and titles are not determinative of equality under the Act. Likewise, a different point value under an evaluation system in use by the employer does not make the jobs unequal under the Act. *Hodgson v. Square D Company, supra* ; 29 (FR 800.121.)

7. The Statute of Limitations for the Fair Labor Standards Act provides:

if the cause of action accrues on or after May 14, 1947—may be commenced within two years after the cause[d] action accrued, and every such action shall be forever barred unless commenced within two years after the cause of action accrued, except that a cause[d] action arising out

**23.** While not binding on the courts, the official administrative interpretations are entitled to great weight. *Roland Electric Co. v. Walling,* 326 U.S. 657, 66 S.Ct. 413, 90 L.Ed. 383 (1946); *U. S. v. American Trucking Ass'ns,* 310 U.S. 534, 60 S.Ct. 1059, 84 L.Ed. 1345 (1940); and see *Idaho Sheet Metal Works v. Wirtz,* 383 U.S. 190, 86 S.Ct. 737, 15 L.Ed.2d 694 (1966). This is particularly true when, as here, it represents the earliest contemporaneous construction of the statute by the authority enforcing it. *American-Trucking Ass'ns, supra,* p. 539, 60 S.Ct. 1059.

**24.** Cong.Rec. Vol. 109, Part 7 (88th Congress, 1st Session).

of a willful violation may be commenced within three years after the cause of action accrued.

29 U.S.C. § 255(a)

The various Circuits have followed two divergent views in determining willfulness. *Laffey v. Northwest Airlines,* 185 U.S.App. D.C. 322, 567 F.2d 429 (1976). Some, notably the 5th Circuit, read "willful" as requiring no more than knowledge of the possible applicability of the governing statute to the conduct eventually held to be legally wanting. *Brennan v. Heard,* 491 F.2d 1 (5th Cir. 1974); *Brennan v. J. M. Fields, Inc.,* 488 F.2d 443 (5th Cir. 1973), *cert. denied,* 419 U.S. 881, 95 S.Ct. 146, 42 L.Ed.2d 121 (1974); *Coleman v. Jiffy June Farms, Inc.,* 458 F.2d 1139 (5th Cir. 1971), *cert. denied,* 409 U.S. 948, 93 S.Ct. 292, 34 L.Ed.2d 219 (1972). Other Circuits have taken a narrower approach requiring that the violations of the Act be deliberate, voluntary, and intentional to constitute "willful" violations. *Hodgson v. United States School Dist.,* 21 W.H.Cas. 574 (D.Kan.1973); *Boll v. Federal Reserve Bank,* 365 F.Supp. 637 (E.D.Mo.1973), *aff'd,* 497 F.2d 335 (1974); *Brennan v. Westinghouse Credit Corp.,* 21 W.H.Cas. 871 (E.D.Tenn.1973). *See also, Hodgson v. Barge, Waggoner and Sumner, Inc.,* 377 F.Supp. 842 (M.D.Tenn.1972), *aff'd* 477 F.2d 598 (6th Cir. 1973).

■ Applying the more stringent approach, the facts as presented in the instant case reveal that while the J. C. Penney Co.'s payment structure represented a good faith attempt to comply with the Equal Pay Act, in the Mentor Store it was deliberately, voluntarily and intentionally applied so as to result in lower wages for females than males in certain substantially equal jobs. The applicable statute of limitations for the Equal Pay Act violations is therefore three years, pursuant to 29 U.S.C. § 255(a).

8. The evidence presented is sufficient to justify the conclusion that despite differences in job titles, requirements, and point values under the Penney's evaluation plan, the Secretary has carried his burden of proof in the following position groupings:

a. 431 and 432 department heads (reclassified as merchandising managers and merchandisers),

b. 055 alterations assistant and 056 alterations supervisor positions,

c. 021 salespersons hired prior to utilization of a standardized rate for all 021s.

While the jobs are not absolutely identical, the differences are incidental, and the jobs are substantially equal in skill, effort, responsibility, and working conditions. *Brennan v. J. M. Fields,* 488 F.2d 443 (5th Cir. 1973), *cert. denied* 419 U.S. 881, 95 S.Ct. 146, 42 L.Ed.2d 121 (1974); *Hodgson v. City Stores,* 479 F.2d 235 (5th Cir. 1973).

■ 9. Once the plaintiff demonstrates that the jobs performed by female employees require substantially equal skill, effort, and responsibility in comparison to the jobs performed by higher-paid male employees, the burden then shifts to the employer to prove that the wage differential is justified under one or more of the Act's four exceptions: a) a seniority system; b) a merit system; c) a system which measures earnings by quantity or quality of production; or d) a differential based on any factor other than sex. *Corning Glass Works v. Brennan, supra,* 417 U.S. 196, 94 S.Ct. 2223. The plaintiff's burden is a heavy one requiring more than general or conclusory allegations. *Brennan v. Owensboro-Daviess County Hospital, supra,* 1031.

■ 10. 29 U.S.C. § 206(d)(1)(iv) provides an exception to the equal pay requirement where there is "a differential based on any other factor other than sex." This exception does not include: training programs which exclude women, *Hodgson v. Behrens Drug Co.,* 475 F.2d 1041 (5th Cir. 1973), *see* Findings of Fact Nos. 29, 30 & 31; merit or seniority, systems not based on objective standards, *Brennan v. Victoria Bank & Trust Co.,* 493 F.2d 896 (5th Cir. 1974); market conditions showing that women can be hired for lower wages than men, *Corning Glass Works v. Brennan, supra;* "the semblance of the valid job classification system may not be allowed to mask the existence of wage discrimination based

on sex," *Brennan v. Prince William Hospital Corp.*, 503 F.2d 282, 285 (4th Cir. 1974), or other seemingly neutral factors which would operate to perpetuate past discrimination, *Corning Glass Works v. Brennan, supra.* While differentials in the payment of wages are permitted when it can be shown that they are based on a seniority system, a merit system, a system measuring earnings by quantity or quality of production, or on any other factor other than sex, the requirements for such an exception are not met unless the factor of sex provides no part of the basis for the wage differential. 29 CFR § 800.142.

11. Defendant has not demonstrated that wage differentials for female and male department heads/merchandisers, position codes 431 and 432, were based on any other factor other than sex which was neutrally applied.

12. Defendant has not demonstrated that wage differentials for the female 055 alterations assistant and the male 056 alterations supervisor was based on any other factor other than sex.

13. Defendant has not demonstrated that wage differentials for female 021 salespersons and for male 021 salespersons hired prior to late 1971, were based on any other factor other than sex.

14. The Secretary seeks to enjoin Penney permanently from withholding unpaid minimum wages and overtime compensation allegedly due certain female employees at the Mentor Store, and from violating Sections 6(d)(1) and 15(a)(2) of the Act at the Mentor Store and all other J. C. Penney stores.

The issuance of an injunction under the Fair Labor Standards Act is addressed to the sound discretion of the trial court. An injunction should not be issued where the court finds sufficient affirmative evidence to indicate intent to comply with the Act. *Wirtz v. Flame Coal Company,* 321 F.2d 558 (6th Cir. 1963); *Hodgson v. Daisy Manufacturing Co.,* 317 F.Supp. 538 (W.D. Ark.1970), *aff'd,* 445 F.2d 823 (8th Cir. 1971).

15. The Court has found that the Penney System is on its face valid as a factor other than sex; however, as applied at the Mentor Store it is not a valid defense because it was applied in a discriminatory fashion. There is no evidence that the System was similarly applied in a discriminatory fashion in any other Penney store. The only evidence which the Secretary has offered involving stores other than the Mentor Store concerns placement statistics on certain "snapshot" dates dealing collectively with all Penney stores regardless of size or type of store and the positions used therein. Collective nationwide statistics of this type are of no assistance to the Court in determining placement patterns in the individual Penney establishments.

Since violations in respect to the wage rates of males and females within a job classification have no bearing upon the validity of the Penney System, nationwide injunctive relief cannot be justified on the basis that the System is applied company-wide. Further, the finding of a violation between males and females within a job classification at the Mentor Store could be attributable solely to the wage practices of the Mentor Store manager, who is responsible for setting individual rates of pay within broad Company guidelines (*see* Baumann Dep., Ex. 13, pp. 7, 118–19, 331–32). The Court cannot entertain a request for a nationwide injunction without evidence first, that similar wage differentials exist between males and females within the same job classification in other Penney stores and second, that any such differentials are not the result of the valid application of some factor other than sex.

The System is applied differently depending on the type, volume, and staffing needs of the individual Penney store. For example, in over 1,000 Penney MAP stores the 076 position is not authorized or used. Tr. 5098–99. Additionally, combinations of merchandise areas for purposes of staffing are determined locally (*see* Baumann Dep., Ex. 13, pp. 274–75). For instance, at the Mentor Store an associate assigned to Girls (1030) is also assigned to Infants (1934), the

two areas being combined into a single staffing area. *E. g.,* Tr. 4958–62, 4965, 2219–20. The merchandise areas which will be combined for staffing purposes will depend upon local store variations in department layouts, square footage and location, traffic flows, and the like. *See* Baumann Dep., Ex. 13, at p. 174.

16. The Secretary has offered no evidence of either staffing patterns or position use in any other single Penney establishment. The Court, therefore, even assuming a violation in effecting the System at the Mentor Store, has no basis to infer that similar violations exist in other Penney Stores.

In fact, representatives of the Department of Labor (DOL) agree that a finding of a violation at a single store in a national retail chain is not evidence of the likelihood of a violation elsewhere. Mr. Leroy Reed, Special Assistant to the Regional Director of the DOL in Atlanta and formerly Area Director of the Atlanta Wage and Hour Division, acknowledged that if the DOL investigated a particular retail store in a national chain, and found violations of the Equal Pay Act, "that wouldn't necessarily mean that there were violations in other stores. That's correct." Reed Dep., Ex. F–1, at p. 51. He went on to say " . . . it depends upon the circumstances in each establishment and each establishment could be different." Def's. Ex. F–1 at p. 51.

Finally, the extensive study of all the jobs in Penney stores undertaken by Penney in the early 1960's in order to assure its compliance with the Equal Pay Act is evidence of its good faith efforts nationwide. Despite the Secretary's claim that Penney has had a "prior history of sex-based wage discrimination" (Pltf's. Br. at 62), there is evidence that the DOL has investigated many Penney stores arriving at conflicting conclusions and, in some instances, concluding that no violation existed. *See* Tr. 5313, 5321, 5339.

The issuance of nationwide injunction in this case, without specific evidence concerning any other of Penney's approximately 1,700 retail establishments, is therefore wholly inappropriate.

*Order for Judgment*

Upon consideration of the above Findings of Fact and Conclusions of Law, IT IS ORDERED THAT:

1. Judgment shall be entered for the plaintiff for the violations found in the following three position groupings:

a. 055 and 056 alterations positions

b. 431 and 432 department heads

c. 021 salespersons hired after May, 1970.

2. Defendant shall compute back wages, subject to verification by the plaintiff, based on the following formulas:

a. 055 and 056 alterations positions. Seamstress Edith Henderson is due the difference between her pay and that of tailor Ted Kacperski for a period beginning three years prior to the filing of the complaint in the instant case and ending at the time their pay rates equalized.

b. 431 and 432 department heads. The six female department heads/merchandisers are to receive back wages based upon the average pay differential between males and females in such positions under comparison, for a period from three years prior to the filing of this suit until their rates shall have been equalized.

c. 021 salespersons hired between May, 1970 and 1975. Those female 021 salespersons are to receive as back wages the difference in hiring pay rates between male 021s and female 021s under comparison for the period from May, 1970 until such time as their rates shall have been equalized.

3. Interest is allowed on back wages due under the Equal Pay Act. Payment of the back wages in No. 1, a, b, and c above shall be with interest at the rate of seven percent (7%) per annum from the dates such amounts became due to the date of equalization of the rates, as requested by the Secretary. *Miller v. Robertson,* 266 U.S. 243, 256–258, 45 S.Ct. 73, 69 L.Ed. 265 (1924); *Hodgson v. American Can Co.-Dixie Products,* 440 F.2d 916, 922 (5th Cir. 1971).

4. 021, 242 and 076 classifications are not each substantially equal to one another, for the purposes of the Act.

5. Plaintiff is not entitled to the nationwide injunctive relief prayed for in the complaint.

6. The 021 Cosmetics sales position is not substantially equal to other sales positions for the purposes of the Act.

Costs are to be taxed against the defendant.