# IN THE SUPREME COURT OF IOWA

No. 22–1291

Submitted December 13, 2023—Filed February 2, 2024

**SANDRA SELDEN,**

    Appellee,

vs.

**DES MOINES AREA COMMUNITY COLLEGE,**

    Appellant.

---

Appeal from the Iowa District Court for Polk County, Scott Rosenberg, Judge.

Following a jury verdict in favor of an employee in a case alleging illegal wage discrimination based on sex and wrongful retaliation, the employer appeals, and the employee cross-appeals. **REVERSED AND REMANDED.**

Mansfield, J., delivered the opinion of the court, in which all justices joined.

Randall Armentrout (argued), Katie Graham, and Haley Hermanson of Nyemaster Goode, P.C., Des Moines, for appellant.

David Albrecht (argued) and Madison Fiedler-Carlson of Fiedler Law Firm, P.L.C., Johnston, for appellee.

Jason M. Craig and Samuel A. McMichael of Ahlers & Cooney, P.C., Des Moines, for amicus curiae Iowa Community Colleges and Iowa Association of Business and Industry.

**MANSFIELD, Justice.**

### I. Introduction.

The plaintiff, after discovering that a male employee was receiving a significantly higher salary than her for doing the same job, voiced a concern with her employer. The employer declined to act on her complaint, explaining that the male employee had been with the company fifteen years longer and that the difference in pay was due to his greater seniority and the initial decision to hire him at a higher point in the salary range because of his thirteen years of relevant experience. A few months later, the plaintiff's supervisor retired, and the plaintiff applied for her job. Her application was screened out because she lacked the required educational qualifications. At this point, the plaintiff initiated a civil rights complaint. She then filed a district court action alleging wage discrimination and retaliation in violation of Iowa Code sections 216.6A and 216.11, the equal pay and "no retaliation" provisions of the Iowa Civil Rights Act (ICRA).

After a trial, a jury awarded damages to the plaintiff on both claims. The employer appeals. We conclude today that the record does not contain substantial evidence of an illegal—as opposed to unfair—pay practice. The employer demonstrated without evidence to the contrary that the pay gap was due to gender-neutral factors. Specifically, it resulted from the effects of a neutral seniority system combined with a decision made to hire the male employee in 1998 at a particular rate based on market conditions and the employee's considerable experience. We also find that the retaliation claim was not supported by substantial evidence because the trial showed that the employer consistently screened out all applicants who lacked the required qualifications and there was no evidence of hostility toward the plaintiff. For these reasons, we

conclude that the district court should have directed a verdict in favor of the defendants, and we reverse and remand for that purpose.

**II. Background Facts and Proceedings.**

**A. DMACC Hires Sandra Selden in 2013.** In July 2013, Sandra Selden applied to work as an Application Support Analyst 2 (ASA 2) at Des Moines Area Community College (DMACC) in Ankeny. Selden had a bachelor's degree in political science and psychology and a master's degree in management with a certificate in nonprofit leadership. From 1997 through 2007, she worked in administrative positions at two higher education institutions in New York. In 2007, she moved to Kansas, where she began working as an administrative business analyst—and later a research analyst and an applications analyst—at Washburn University. There, she gained experience with Banner, an enterprise software used by many higher education institutions, including Washburn and DMACC.

According to DMACC's 2013 job posting, the ASA 2 position at the time had a hiring range of $64,859 to $81,074. Selden was offered the job at an annual salary of $68,000; she countered at $72,000; and the parties settled on $70,000.

**B. Selden Raises a Concern About Pay Equity in January 2019.** Selden received regular annual increases such that her salary by fiscal year 2019 had reached $82,292. However, over time, Selden became aware that a male employee holding the same ASA 2 position, Bryan Tjaden, made substantially more money than her, and that he also made somewhat more than three other women who also worked as ASA 2s. For example, during fiscal year 2019, Tjaden was paid $108,681.

On January 9, 2019, Selden spoke with her boss, Linda Fiderlick, about a lack of pay equity. Fiderlick forwarded Selden's complaint to Employment

Director Kim Lacey for a response. Lacey responded in an email that Tjaden had fifteen years more seniority than Selden. Lacey added that while the other three women had roughly the same amount of experience as Tjaden, she assumed Tjaden "came in with a higher salary . . . [in 1998] because of his strong technical background in information systems." Lacey's email was provided to Selden.

**C. Bryan Tjaden's Hiring in 1997–1998.** In fact, Tjaden had joined DMACC in 1998 as an ASA 2, whereas the other three women had worked as ASA 1s until their jobs were reclassified as ASA 2s in 2000.[1] When Tjaden was hired, the posted salary range for his position was $36,257 to $54,385. At that time, Tjaden had an associate of applied science (AAS) as a systems analyst and thirteen years of experience as a computer operator, applications programmer, and information analyst, including the last three years with Principal Financial Group. Tjaden requested a starting salary of $46,000 which DMACC agreed to. This was the same salary Tjaden had been earning at Principal.

In 1997, when Tjaden applied to DMACC, the job market was good for programmers because of the "Y2K effort."[2] According to Tjaden, there was a push around the country to ensure that computer software "could handle the change of the century" and "to make sure the software was compliant to the year 2000." He stated that Principal was offering raises to all its programmers to retain them. Tjaden's starting salary of $46,000 amounted to approximately 53.75% of the difference between the posted minimum and the posted maximum in the job listing.

---

[1]We refer to the ASA positions by their current titles throughout this opinion. In 1998, the role had a different title but involved essentially the same duties.

[2]The concern was that existing computer software and hardware—and the systems they supported—would be unable to handle the transition from December 31, 1999, to January 1, 2000.

In addition, at that time, DMACC badly needed employees to support Banner. As one of the employees hired in that time period testified, "We were the first people hired to just support Banner. [DMACC] had just come up on Banner."

**D. Selden Applies for a Supervisory Position in April 2019.** Shortly after Selden had the discussion raising her pay equity concerns, Fiderlick announced her retirement. A job posting for the supervisor position went up on March 7. It was originally scheduled to close on March 31. As the closing date approached, Lacey noticed there were only five applicants. She felt that this was a small pool of applicants, so the application deadline was extended. Selden applied on April 3 with the support of her colleagues.

The job posting stated that applicants were required to have a bachelor's degree in computer science or a related field. Several applicants, including Selden, did not have a bachelor's degree in computer science or a related field. Lacey screened them out and did not forward their applications to the hiring committee. The job eventually went to Dražen Jocić, who had a bachelor's degree in management with concentrations in information systems and business administration.

Selden and Tjaden both remain employed at DMACC.

**E. Selden Brings Suit Against DMACC.** On August 8, Selden filed employment discrimination and retaliation charges against DMACC with the Iowa Civil Rights Commission (ICRC). On January 2, 2020, the ICRC issued Selden a right-to-sue letter regarding these charges. The following month, Selden filed a petition against DMACC in the Iowa District Court for Polk County. She raised two claims. First, that DMACC was not paying her equal wages for equal work as compared with Tjaden, in violation of Iowa Code section 216.6A(2)(*a*) (2019). Second, that DMACC had denied her a promotion in retaliation for her internal complaint, in violation of Iowa Code section 216.11(2).

**F. Trial.** On November 1, 2021, the parties proceeded to a jury trial. On the wage discrimination claim, Selden didn't challenge Tjaden's higher compensation to the extent it was due to his seniority, nor did she complain about the regular lockstep pay increases they had both received over the years. Her contention, rather, was that DMACC engaged in unlawful wage discrimination by starting her at a relatively lower salary within the initial pay range in 2013 as compared to Tjaden in 1998. As Selden has reiterated in her appellate brief, "The relevant issue for the jury was Defendant's pay practices at the time it hired Tjaden and at the time it hired [Selden]."

According to Selden's calculations, when she started work in 2013, her $70,000 salary only placed her at 15% between the bottom and the top salary in the pay scale.[3] When Tjaden began in 1998, his $46,000 salary (equivalent to about $66,000 in 2013 dollars) put him at 54% between the bottom and the top salary in his pay scale. Selden's theory was that she should have started at the 54% interval in the pay scale in 2013, and received commensurate lockstep pay increases thereafter.

In addition to seeking damages for the wage differential dating back to 2013 and for lost income for not getting the supervisor position, Selden also sought emotional distress damages. Selden testified that it was "humiliating" to have people ask her why she didn't apply for the supervisor position and to have to tell them that she did apply but did not get an interview. She said, "I'm just generally less happy than I was before." She said she used to bake a lot and does not do that any longer.

---

[3]We are not sure exactly how Selden calculated her 15% figure because the posted salary range for Selden's position was $64,859 to $81,074. Thus, $70,000 put her at about 32% of the differential between bottom and top. We believe that Selden may have used as the upper limit of her range the highest possible pay *anyone* could receive in that position—even if they had been already working at DMACC for years—not the highest possible pay *a new hire* could earn.

Selden's spouse and father also testified regarding the emotional distress claim. Selden's spouse elaborated that "the joy [in her] just really began to diminish." He added that Selden was crying more, was unsure of herself and questioned herself, and emotionally had been "tapped out." Selden's father testified that Selden didn't seem as outgoing as before. In his words, she had "lost that focus on her family," "seemed a little bit upset all the time," and was "a little short sometimes with her daughters." Selden did not present any evidence that she had undergone any therapy or other treatment for emotional distress.

At the close of the evidence, DMACC moved for a directed verdict on both of Selden's claims. On the wage discrimination claim, DMACC urged that Tjaden wasn't a valid comparator for legal purposes because he had started fifteen years before Selden. DMACC also argued that the evidence established conclusively as an affirmative defense that any difference in pay was due to factors other than sex. *See* Iowa Code § 216.6A(3). In addition, DMACC insisted that even if there were evidence of an equal-pay violation, no evidence existed that it was willful so as to support a treble damage award. *See id.* § 216.15(9)(*a*)(9)(b).

DMACC also maintained that Selden had not proved the elements of a retaliation claim. In DMACC's view, Selden had not presented substantial evidence that she had opposed an unlawful practice or was retaliated against. *See id.* § 216.11(2). Additionally, DMACC argued that the statute of limitations barred Selden from raising any wage differentials that preceded the 300-day filing limitation under the ICRA. *See id.* § 216.15(13). Further, DMACC argued that emotional distress damages and lost pension benefits were not recoverable as damages on the wage discrimination claim.

The district court denied DMACC's motion and submitted Selden's entire case to the jury. The jury returned a verdict in Selden's favor on both claims. It

awarded $223,571 in total backpay on the wage discrimination and retaliation claims, $720,975 in past and future emotional distress damages for wage discrimination, and $434,375 in past and future emotional distress damages for retaliation. The jury also found that DMACC's violation of the wage-discrimination law had been "willful."

**G. Posttrial Motions and Appeal.** Posttrial, the district court reconsidered its earlier view that emotional distress damages were recoverable on equal-pay claims and granted DMACC's motion for judgment notwithstanding the verdict on that point. Otherwise, it overruled DMACC's posttrial motion and entered judgment for Selden on the verdict. The court also awarded Selden $217,966 in attorney fees and costs and, as equitable relief, directed DMACC to email its employees about "their right to access their wage information, along with directions on how to access it." DMACC appealed and Selden cross-appealed.

On appeal, DMACC raises a number of issues. It maintains that the district court erred (1) in denying a directed verdict on Selden's wage-discrimination claim, (2) in denying a directed verdict as to whether any violation was willful, (3) in rejecting its argument that the statute of limitations barred any wage-discrimination recovery for the period predating the ICRA's 300-day complaint-filing window, and (4) in refusing to direct a verdict on Selden's retaliatory failure-to-hire claim. DMACC also argues that the backpay and emotional distress awards were excessive and that the district court committed evidentiary errors.

Selden's cross-appeal asserts that the district court erred in taking away the emotional distress damage award on the wage-discrimination claim. We retained the appeal.

**III. Standard of Review.**

We review district court rulings on motions for directed verdict and judgment notwithstanding the law "for the correction of errors at law." *Godfrey v. State*, 962 N.W.2d 84, 99 (Iowa 2021). When considering a jury verdict, "we 'view the evidence in the light most favorable to the party against whom the motion is made.' " *Id.* (quoting *McClure v. Walgreen Co.*, 613 N.W.2d 225, 230 (Iowa 2000) (en banc)).

We consider issues of statutory interpretation for correction of errors at law. *Ackelson v. Manley Toy Direct, L.L.C.*, 832 N.W.2d 678, 680 (Iowa 2013).

"We generally review claims of evidentiary errors for an abuse of the district court's discretion." *Vroegh v. Iowa Dep't of Corr.*, 972 N.W.2d 686, 697 (Iowa 2022).

When evaluating excessive damages claims, "we view the evidence in the light most favorable to the plaintiff." *Kuta v. Newberg*, 600 N.W.2d 280, 284 (Iowa 1999). We will disturb a jury's damages verdict only if it is "flagrantly excessive or inadequate, so out of reason so as to shock the conscience, the result of passion or prejudice, or lacking in evidentiary support." *Id.* (quoting *Olson v. Prosoco, Inc.*, 522 N.W.2d 284, 292 (Iowa 1994) (en banc)).

**IV. Legal Analysis.**

**A. Should a Directed Verdict Have Been Granted on the Wage-Discrimination Claim?** We first consider whether the district court should have granted a directed verdict on Selden's wage-discrimination claim. Iowa Code section 216.6A is "Iowa's equal pay law." *Dindinger v. Allsteel, Inc.*, 860 N.W.2d 557, 559 (Iowa 2015). It is our state's counterpart to the Federal Equal Pay Act, which has similar wording. *See id.* at 564–65. Specifically, section 216.6A(2)(*a*) states,

> It shall be an unfair or discriminatory practice for any employer or agent of any employer to discriminate against any employee because of the . . . sex . . . of such employee by paying wages to such employee at a rate less than the rate paid to other employees who are employed within the same establishment for equal work on jobs, the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions.

Iowa Code § 216.6A(2)(*a*). Section 216.6A is a "strict liability" statute: the employee need not show the employer acted with discriminatory intent. *Dindinger*, 860 N.W.2d at 564–65.

The remedy for a violation of section 216.6A includes either of the following: "[a]n amount equal to two times the wage differential paid to another employee compared to the complainant" or "[i]n instances of willful violation, an amount equal to three times the wage differential." Iowa Code § 216.15(9)(*a*)(9).

Section 216.6A recognizes, however, that there may be circumstances where a wage disparity is justified, such as a seniority system. Thus, the employer has an affirmative defense in the following circumstances:

> *a.* Payment of wages is made pursuant to a seniority system.
>
> *b.* Payment of wages is made pursuant to a merit system.
>
> *c.* Payment of wages is made pursuant to a system which measures earnings by quantity or quality of production.
>
> *d.* Pay differential *is based on any other factor other than* the . . . sex . . . of such employee.

*Id.* § 216.6A(3) (emphasis added).

Both the liability standard and the affirmative defenses resemble the standards set forth in the Federal Equal Pay Act, which provides,

> No employer . . . shall discriminate . . . between employees on the basis of sex by paying wages to employees in such establishment at a rate less than the rate at which he pays wages to employees of the opposite sex in such establishment for equal work on jobs . . . which require[] equal skill, effort, and responsibility, and which are performed under similar working conditions, except where such

payment is made pursuant to (i) a seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity or quality of production; or (iv) a differential based on any other factor other than sex . . . .

29 U.S.C. § 206(d)(1) (2019).

No one disputes that Selden and Tjaden performed the same jobs and that Tjaden was paid significantly more. And no one disputes that Tjaden had fifteen years of seniority on Selden, that the seniority system functioned in a gender-neutral way, and that the seniority system accounted for much of the difference in pay. Selden's theory—for which she can cite no equal-pay-law precedent involving comparators so many years apart—is that it violated section 216.6A for DMACC to pay her $70,000 *in 2013* when she joined, or what she claims to be 15% of the difference between the bottom and top of the pay scale for the position, while paying Tjaden $46,000 *in 1998* when he joined, or what she claims to be 54% of the difference between the bottom and top of the pay scale for the position at that time.[4] As Selden explains, if she had started in 2013 at 54% of the potential pay range, she would have received more wages over the years, since DMACC gave every ASA 2 the same percentage pay bump every year. Selden's wages still would have been less than Tjaden's, but the gap would have been smaller.

But this assumes one can compare the beginning of 1998 to the second half of 2013, a gap of some fifteen-and-a-half years. Wage-discrimination claims are typically proved through a comparator, a favored individual who is paid more than the plaintiff. We pass over the question of whether the starting salary of someone hired in 1998 can be compared to the starting salary of someone hired in 2013. Even if it can, DMACC offered unrebutted evidence that market conditions for hiring information technology (IT) personnel were more demanding

---

[4]As noted above, Selden was hired at 32%—not 15%—of the advertised pay range.

in 1998 and that Tjaden had more relevant experience than Selden when each of them was hired.

Economic conditions can be a valid justification for starting employees at different rates at different times. In *Sowell v. Alumina Ceramics, Inc.*, a female tool maker was paid less than two males who were hired after her. 251 F.3d 678, 681 (8th Cir. 2001). She sued her employer on various discrimination charges, and the district court granted her employer's motion for summary judgment. *Id.* at 681–82. The United States Court of Appeals for the Eighth Circuit held that the employer's "defense that it had to pay higher wages to these newly hired tool makers because of job market demands" was a valid factor other than sex to explain the pay differential. *Id.* at 684.

This is not to say that references to market conditions automatically end all debate. Obviously, an employer can't argue that men should receive more simply because it is harder to hire male employees. *Corning Glass Works v. Brennan*, 417 U.S. 188, 205 (1974) (condemning a pay differential that "arose simply because men would not work at the low rates paid women"). Nor can an employer rely on economic conditions to justify a pay differential when those conditions would have applied across the board to both the plaintiff and the comparator. *See Dindinger v. Allsteel, Inc.*, 853 F.3d 414, 423 (8th Cir. 2017) ("[T]o the extent the merit-based pay raise freeze affected wages, the evidence demonstrates that it did not cause the plaintiffs to be paid less than their male comparators, but merely held pre-existing wage differentials in place.").

But DMACC showed that it was a seller's market for IT personnel in 1998, when Tjaden was hired, as contrasted with 2013, when Selden was hired. A labor economist testified that the widespread concerns about Y2K had an impact on the late 1990's market. As he explained,

[T]hey're operating in the same labor market as the companies who are worried about their computer systems failing. So there's all these other employers trying to hire people with those coding skills.

Even if you're a company who isn't worried that their computer system is going to fail, if they're trying to hire people to do a job and those people have the skills to be able to fix somebody else's computing systems, you're going to have to fight over that person. So that's going to affect the pay that you have to offer them to come to work for you.

Conversely, the market for IT personnel looked quite different when Selden was hired in 2013. The same labor economist testified,

[I]n 2013 we were sort of coming out of the aftermath of the Great Recession. The Great Recession was started in 2008, 2009, maybe the very end of 2007. The labor market was in very bad shape in 2009 and 2010. Lots of people lost their jobs. The labor market was starting to recover, but was still feeling the aftereffects of the recession by 2013.

There also was a lot of advancement in computing technology between 1998 and 2013, so there was a lot more people using things like the internet in 2013 as compared to 1998, so all those things would tend to make the labor markets different in 1998 and 2013.

Selden argues that DMACC was not worried about suffering a Y2K catastrophe itself because it was using relatively new enterprise software. But this does not alter the fact that there were effects on the labor market within which DMACC had to hire. Tjaden testified that his former employer was attempting "to retain their programmers by giving everybody a raise." When Tjaden joined DMACC, he received $46,000 annually because he asked to be paid the same amount as he was receiving at that prior employer:

Q. Did you have any negotiation with DMACC about your starting pay? A. Not that I recall. My only desire was to make the same that I was making at [my prior job].

Q. So did you tell DMACC the dollar amount of what you wanted to earn? A. I'm sure I would have, yeah.

. . . .

Q. 46,000 is the dollar amount you asked DMACC to pay you?
A. I would say yes.

Q. That's what you were being paid at [your former job]?
A. Yes.

Fifteen-and-a-half-years later, Selden requested a salary of $72,000 and ultimately agreed to $70,000, which was $20,000 more than the $50,000 per annum she was getting from Washburn in Kansas:

Q. You negotiated your starting salary with Linda Fiderlick; is that right? A. Yes.

Q. Linda offered you $68,000; correct? A. Correct.

Q. You went back with a counteroffer for $72,000; correct?
A. Correct.

Q. Linda came back and offered you 70? A. Yes.

Q. You accepted the $70,000 as your starting salary; right?
A. Yes.

We are not saying that differences in prior salary alone can justify disparate pay for men and women. But here the record shows that DMACC *didn't* base salary offers on prior compensation with Selden in 2013 and did so with Tjaden in 1998 only because—given market conditions—they had to match his existing salary to get him to come work for them. *See Horner v. Mary Inst.*, 613 F.2d 706, 714 (8th Cir. 1980) ("There is evidence to find that Stearns met Thorne's demand not because Thorne was male but because Thorne's experience and ability made him the best person available for the job and because a higher salary was necessary to hire him. The differential was based on a factor other than sex.").

DMACC also showed that Tjaden had more IT experience when he was hired. Selden disputes how much more, but it was clearly greater than her own. *See Mayorga v. Marsden Bldg. Maint. LLC,* 55 F.4th 1155, 1161 (8th Cir. 2022) ("A 'differential that is based on education or experience is a factor other than

sex.' " (quoting *Hutchins v. Int'l Bhd. of Teamsters*, 177 F.3d 1076, 1081 (8th Cir. 1999))); *Wyant v. Burlington N. Santa Fe R.R.*, 210 F. Supp. 2d 1263, 1291 (N.D. Ala. 2002) ("[E]xperience is an acceptable factor other than sex if [it is] not used as a pretext for differentiation because of gender." (second alteration in original) (quoting *Irby v. Bittick*, 44 F.3d 949, 956 (11th Cir. 1995))).

Selden has little by way of response. She cites *Marshall v. J.C. Penney Co.* as involving discrimination in the pay scales for male and female employees across a nine-year period. *See* 464 F. Supp. 1166, 1179 (N.D. Ohio 1979) (noting that the company "continues to maintain unlawful wage differentials" from "1970 [to] the present"). But the court there compared the pay scales year by year as between men and women, not one person's starting salary in 2013 to another person's starting salary in 1998. *See, e.g.*, *id.* at 1184. She also cites *Ledbetter v. Alltel Corporate Services, Inc.*, as approving a damages award that utilized "penetration rates" and what a Black employee would have earned hypothetically at a different penetration rate. *See* 437 F.3d 717, 724–26 (8th Cir. 2006). *Ledbetter*, though, was a Title VII case, and there was no indication that the plaintiff was trying to draw a comparison between two penetration rates for a pair of employees fifteen years apart. *See id.* at 720–21.

Selden's main argument is that DMACC failed to prove that it placed Tjaden at a higher level on the pay scale in 1998 *because of* his superior experience or market conditions. We disagree. There was unrebutted evidence that market conditions were favorable for computer programmers in 1998, that Tjaden asked DMACC to match his existing salary of $46,000, and that matching that salary was his "only desire." Documentary evidence from the personnel file indicates that DMACC valued him for having "thirteen years experience in information systems" and a "strong technical background." It is true that the supervisor who prepared this document and could have spoken directly to

Tjaden's hiring didn't testify at trial; he no longer worked at DMACC and, twenty-three years later, may not have been available. But given the years that had passed, DMACC's combination of expert testimony about market conditions in 1998, direct testimony about the same, direct testimony from Tjaden, and documentary evidence about Tjaden's hiring was more than enough to establish an unrebutted affirmative defense. Any other result would lead to a paradox: The more time that separates a comparator from the plaintiff, the harder it would be for an employer to defend itself and the easier it would be for a plaintiff to prove their case. In sum, DMACC established its affirmative defense, and Selden presented no evidence to the contrary. *See Mayorga*, 55 F.4th at 1161. Accordingly, DMACC was entitled to a directed verdict on the wage-discrimination claim.

**B. Should a Directed Verdict Have Been Granted on the Retaliation Claim?** DMACC argues that Selden failed to prove the elements of a retaliation claim and that it was entitled to a directed verdict. The ICRA provides:

> It shall be an unfair or discriminatory practice for . . . [a]ny person to discriminate or retaliate against another person in any of the rights protected against discrimination by this chapter because such person has lawfully opposed any practice forbidden under this chapter, obeys the provisions of this chapter, or has filed a complaint, testified, or assisted in any proceeding under this chapter.

Iowa Code § 216.11(2).

Under Iowa law, "[t]o prevail on a statutory retaliation claim, the plaintiff must show '(1) that he or she engaged in statutorily protected activities; (2) an adverse employment action was taken against him or her; and (3) a causal connection exists between the two events.' " *Godfrey*, 962 N.W.2d at 106–07 (quoting *Sellers v. Deere & Co.*, 23 F. Supp. 3d 968, 986 (N.D. Iowa 2014)).

DMACC does not challenge the first or second elements but contends that Selden failed to prove the third element of the test. "To establish a causal connection, the plaintiff must show the plaintiff's protected activity was a *motivating factor* in the employer's subsequent adverse employment action." *Id.* at 107 (emphasis added) (citing *Hawkins v. Grinnell Reg'l Med. Ctr.*, 929 N.W.2d 261, 272 (Iowa 2019)); *see also Rumsey v. Woodgrain Millwork, Inc.*, 962 N.W.2d 9, 31–32 (Iowa 2021) (stating that the *motivating standard* is "the proper standard for assessing that causal connection"); *Haskenhoff v. Homeland Energy Sols., LLC*, 897 N.W.2d 553, 602 (Iowa 2017) (Cady, C.J., concurring in part and dissenting in part) ("I concur in the opinion of Justice Appel to adopt the motivating factor causation standard."). But "temporal proximity is generally insufficient alone to establish the causal connection." *Rumsey*, 962 N.W.2d at 33.

The undisputed evidence in this case establishes that Selden was screened out for the supervisor position because she lacked the required degree. All the candidates who lacked a degree in computer science or a related field were screened out, and the person who was ultimately hired had such a degree. Selden points out that Lacey did the screening, which occurred in April 2019, approximately three months after Selden had complained to Lacey about pay equity. But after all, Lacey was *the Employment Director*. There is no evidence that Lacey had an animus against Selden and certainly no direct evidence of retaliation. Selden makes much of the fact that Lacey updated her own boss on January 10, 2019, with an email that stated, "Just keeping you informed . . . hopefully no more will come of this." We are unable to detect any personal hostility toward Selden from this email. In addition, there is no evidence that Selden had any communications regarding pay equity during the three months

preceding her application for the supervisor position or preceding the date when her application was screened out.

Selden also points out that Fiderlick—the supervisor who was being replaced—lacked a college degree in computer science or a related field. But the undisputed evidence established that the degree requirement had been put in place in 2007 and that Fiderlick had been grandfathered in at that time based on standard DMACC policy. Lacey testified that she had never made any exceptions in the hiring process to the posted required qualifications: "[T]hat wouldn't be fair to other applicants if we hired somebody with other qualifications that weren't posted." This was confirmed by DMACC's hiring handbook, which was introduced into evidence.

Selden notes that Lacey was unaware at the time that the outgoing supervisor, Fiderlick, lacked a college degree in computer science or a related field. It is puzzling why Selden believes this fact supports her position. If anything, it tends to negate any suggestion that Lacey screened out Selden in bad faith, being unaware of the degrees held by her predecessor.

Selden also argues that Tjaden himself in 1998 was hired as an ASA 2 even though he lacked the bachelor's degree then required for that position. (Tjaden had only an AAS as a systems analyst.) Yet Selden glosses over the enumerated exception in the job posting for the ASA 2 position: a candidate could substitute relevant experience for education, with six months of experience equivalent to fifteen semester credit hours. Tjaden had thirteen years of relevant experience.

In defending the jury's verdict, Selden maintains that "it was *the jury* . . . who determined she was not only qualified, but the most qualified," to be supervisor. Yet this misconceives the purpose of chapter 216. It is neither the jury's role, nor our role, "to sit as super-personnel departments reviewing the

wisdom or fairness of the business judgments made by employers," provided those actions do not violate an actual prohibition in chapter 216. *Feeback v. Swift Pork Co.*, 988 N.W.2d 340, 350 (Iowa 2023) (quoting *Vroegh*, 972 N.W.2d at 695). Selden failed to present substantial evidence that retaliation was a motivating factor in her being denied a promotion for which she lacked a necessary qualification. Therefore, DMACC was entitled to a directed verdict on the retaliation claim.[5]

Because we have concluded that the district court should have directed a verdict for DMACC on Selden's wage-discrimination and retaliation claims, we need not reach DMACC's remaining contentions on appeal or Selden's cross-appeal.

**V. Conclusion.**

For the foregoing reasons, we reverse the district court's order and remand for entry of judgment for DMACC in accordance with this opinion.

**REVERSED AND REMANDED.**

---

[5]An illustrative federal case is *Mount v. Johnson*, 174 F. Supp. 3d 553 (D.D.C. 2016), decided by Justice Jackson when she served on the United States District Court for the District of Columbia. The plaintiff claimed that the defendant had denied him a promotion in retaliation for his prior filing of an EEO discrimination charge. *Id.* at 558. The plaintiff, however, did not possess some of the required qualifications for the new position. *Id.* at 564–65. The district court granted summary judgment to the defendant, reasoning that the four-month proximity between the filing of the charge and the denial of the promotion was not enough for the plaintiff to get to the jury. *Id.* at 565–66.